193 N.J. Super. 676 (1984)
475 A.2d 665
PUBLIC SERVICE ELECTRIC AND GAS COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, JERSEY CENTRAL POWER & LIGHT COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, AND ATLANTIC CITY ELECTRIC COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, APPELLANTS,
v.
THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE STATE OF NEW JERSEY, RESPONDENTS. ROLLINS ENVIRONMENTAL SERVICES, (N.J.), INC., APPELLANT,
v.
THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT. MAGNESIUM ELEKTRON, INC., A NEW JERSEY CORPORATION, APPELLANT,
v.
THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 13, 1984.
Decided April 25, 1984.
*679 Before Judges ANTELL, JOELSON and McELROY.
Scott M. Duboff argued the cause on behalf of appellants Public Service Electric and Gas (Bischoff, Lieberman, Cook, Purcell, and Reynolds, attorneys).
Paul H. Schneider, Deputy Attorney General argued the cause for respondents N.J. Department of Environmental Protection (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Deborah T. Poritz, Deputy Attorney General, of counsel and Paul H. Schneider on the brief).
Alvin E. Granite argued the cause for appellant Rollins Environmental Services (Granite and Heim, attorneys; Alvin E. Granite and Craig H. Klayman on the brief).
I. Leo Motiuk argued the cause for appellant Magnesium Elektron, Inc. (Schaff, Motiuk, Hornby, Gladstone & Knox, attorneys; I. Leo Motiuk on the brief).
The Opinion of the Court was delivered by, ANTELL, P.J.A.D.
The New Jersey Department of Environmental Protection (DEP) is responsible for issuing permits as part of a program regulating the discharge of pollutants into surface waters. Its authority is derived from the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., which was enacted in order for the State of New Jersey to administer federally mandated programs aimed at prohibiting all discharges of pollutants into surface waters except those which conform *680 with a National Pollutant Discharge Elimination System (NPDES) permit issued by the United States Environmental Protection Agency (USEPA) or by a state having a similar permit system approved by the USEPA. The federal program is set forth in the Federal Clean Water Act, 33 U.S.C.A. § 1251 et seq. The New Jersey Water Pollution Control Act has a purpose similar to the federal legislation and among other things is intended to implement the federal act by the issuance of New Jersey Pollutant Discharge Elimination System (NJPDES) permits to municipal, industrial and thermal dischargers.
Under N.J.S.A. 58:10A-9 it is directed that DEP "shall, in accordance with a fee schedule adopted by regulation, establish and charge reasonable annual administrative fees, which fees shall be based upon, and shall not exceed, the estimated cost of processing, monitoring and administering the NJPDES permits." These appeals, which we have consolidated sua sponte, are taken from the fee structure promulgated by DEP under N.J.A.C. 7:14A-1.8(c)(3)(ii) for the period between March 1982 through June 1983 and from DEP's determination as to the amount of a credit for excess fee assessments calculated during the period March 1981 through February 1982. Appellants, consisting of a number of companies classified as thermal and industrial dischargers, maintain that the fee assessments are unrelated to expenses involved in the processing, monitoring and administering of the permit program and that the assessment methodology is therefore arbitrary, capricious and unreasonable.
Concisely, the method chosen by DEP to distribute the costs of processing, monitoring and administering the program among the permittees purports to be based upon the volume of effluent discharged by each with the largest volume dischargers bearing the greatest share of the cost. Appellants argue that no relationship exists between volume of discharge and regulatory costs, pointing out that their repeated requests of DEP to demonstrate such a relationship have produced nothing *681 beyond the agency's unexplained insistence that such a relationship necessarily exists.
On this appeal little is said by DEP beyond adherence to the dogma that "regulatory costs must generally increase as the size of permittee's pollutant discharge increases." It states as a fact that to accomplish its statutory purpose it must allocate regulatory resources commensurately with the relative dangers posed by various dischargers. Nowhere, however, does it demonstrate in terms of work hours expended or by any other gauge that the cost of processing, monitoring and administering the permit of a high volume single outlet discharger is any greater than the cost made necessary by a small single outlet discharger. Nor does it show how the mere volume alone of a permitee's discharge reflects its potential injuriousness. DEP's assertions to the contrary are couched in conclusory form and appear to be nowhere anchored to the facts of record. We therefore note our agreement with appellants' contention that the volume based fee formula is neither cost-related nor related to the hazard posed by the individual permittee.
We disagree, however, with appellants' premise that the enabling statute requires that DEP determine its fee structure on a permit-specific cost-related basis. We read N.J.S.A. 58:10A-9 to require only that the individual fees be "reasonable" and that in the aggregate they not exceed "the estimated costs of processing, monitoring and administering the NJPDES permits." The only obligation imposed upon DEP is that the agency must find some reasonable way of apportioning its operating expenses among the permittees. Whether this is done on an individual cost basis or in some other way is a decision the legislature has left to the agency. Where the legislature intends that a license fee relate to the regulatory expense involved in processing the application it has no difficulty in expressing itself. See, for example, N.J.S.A. 5:12-139 which provides that the issuance fee for a casino license "shall *682 be based upon the cost of investigation and consideration of the license application...."
Among the choices open to DEP in allocating its costs, of course, is that of charging each permittee an equal share of the expenses. Obviously, this course was not followed for the reason that it would place the same financial burden on a permittee which discharges a low volume of low toxic effluent as on one having a large volume of high toxic waste. In determining to avoid such a result we can hardly say that DEP acted unreasonably. Yet, from the contention asserted by appellants themselves that the volume based fee structure is unrelated to costs, it would appear that the permit-specific cost-related fee schedule which they advocate would probably bring about the very result which DEP quite reasonably wants to avoid, that is, charging the same fees to high and low volume dischargers alike. If DEP chooses to eschew this result we cannot say that such a decision lies beyond its lawful discretion.
In our view, DEP's volume based fee schedule is supportable only on the proposition that those who do most to create the injurious conditions which give rise to the need for regulation should fairly bear a greater share of the regulatory costs. This is what it seems to aim at, and if the challenged regulation did actually scale the fee structure proportionally to the degree of harm threatened by the permittee's discharge we would have no difficulty in sustaining its validity. As we shall see, however, it falls significantly short of this purpose and, lacking any other reasonable justification, must be adjudged invalid.
N.J.A.C. 7:14A-1.8(c)(3)(ii) provides that the yearly fee for a discharger of industrial pollutants is to be based on the "average daily quantity" of whichever of seventeen listed pollutants "is discharged in the largest amount." Its defects are twofold. First, it does not take into account the toxicity or the potential hazard of the measured pollutant which forms the basis of the permittee's fee. Hence, a permittee whose fee is based upon a relatively low volume of a highly toxic pollutant, the impact of *683 which on the environment is great, pays less than a relatively high volume discharger of a non-toxic harmless pollutant which has a negligible impact. Because the toxicity of the measured pollutant is not factored into the assessing process there can be no proportionality between the fees paid by the permittees and the degree of hazard threatened by their discharge.
In its Summary of Public Comments and Agency Responses the agency indicated that the absence of "a weighting factor to reflect the hazardous nature of the waste constituent is a difficult problem which * * * needs to be seriously considered ...," and that it would "welcome the development of a weighting factor ... by any interested group and would give serious consideration to the inclusion of such a methodology for the Fiscal Year 1983/84." The possibility that this approach may become a reality is therefore not entirely out of the question. But by nothing we have said do we intend to suggest what course the agency should follow. As we have stated, N.J.S.A. 58:10A-9 does not indicate any particular mode of fixing individual permit fees except that the method chosen must be reasonable. Within this limitation the choice of a least burdensome, workable system is left to the agency. We only say that any assessment system purportedly geared to the degree of hazard posed by a permittee's discharge which takes into account only volume without regard to toxicity of the discharge is less than reasonable.
The regulation is faulty for the further reason that, as noted, fees for industrial dischargers are calculated upon the volume discharged only of that single pollutant out of a list of seventeen which the permittee discharges in greater volume than the others. Because the discharge volume of the other sixteen pollutants may in combination greatly exceed the toxicity and volume of the pollutant on which the fee is based, a permittee whose fee is based on a low volume of one pollutant but whose combined discharge of numerous other pollutants is high in both toxicity and volume pays less than another whose fee is based on a high volume of a single non-toxic harmless pollutant *684 and whose discharge is free of any other pollutant. Furthermore, it can be seen from what we have said that even if we accept DEP's contention that volume alone, without regard to toxicity, is a reasonable criterion for the assessment of NJPDES fees, in fact the regulation as drafted actually does not base the fees upon the real volume of total pollutants discharged, but only upon a meaningless fraction thereof.
For the reasons given we conclude that the methodology chosen by DEP for the assessment of NJPDES permit fees for industrial dischargers of pollutants bears no relationship to any recognizable legislative policy and does not subserve the statutory requirement that permit fees be established in a reasonable manner. The method chosen cannot be explained except as an arbitrary and haphazard distribution of administrative expenses without any coherent standard, and we therefore determine so much of the regulation under review fixing those fees to be invalid.
There is no question as to the principles we are called upon to apply. Administrative regulations are presumed valid. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561 (1978); N.J.Fed. of Physicians & Dentists v. Klein, 144 N.J. Super. 467, 471 (App.Div. 1976). The burden of overcoming this presumption rests on the party attacking the validity of the regulation. N.J. Pharmaceutical Assn. v. Klein, 140 N.J. Super. 16, 23 (App.Div. 1976). Regulations supported by credible evidence in the record must be considered valid. Schwerman Trucking v. Dept. of Env. Protection, 125 N.J. Super. 14, 18-19 (App.Div. 1973). Moreover, the court must defer to the administrative agency's expertise in relation to technical matters. In re application of Howard Savings Bk., 143 N.J. Super. 1, 11 (App.Div. 1976). However, "[i]t is firmly settled that arbitrary and capricious action by an administrative or executive agency should be overturned." Worthington v. Fauver, 88 N.J. 183, 204 (1982).
*685 At oral argument appellants expressed their willingness to accept, in the form of a credit against future NJPDES permit fees assessed under such valid regulation which may be hereafter promulgated, whatever refund may be due them as the result of our action here taken. Accordingly, we find it unnecessary to deal further with this issue. As to DEP's obligation to refund the amount of overassessed fees, and for some guidance as to the methodology for calculating the amount of the refund see In Re Fees of State Bd. of Dentistry, 84 N.J. 582 (1980).
The group of electric utility companies which are appellants under Docket No. A-2798-82T3 further contend that DEP's allocation of overall costs to thermal dischargers is "irrational and unexplained" and that the agency's credit for 1981-82 is based on arbitrary manipulation of budget figures and is not supported by the record. As to the first, we conclude that the degree of potential harm to the environment presented by thermal dischargers is a technical matter within the special competence of the administrative agency and with respect thereto we defer to its expertise. See, In re application of Howard Savings Bk., 143 N.J. Super. 1, 11 (App.Div. 1976); New Jersey Bell Telephone Company v. State, 162 N.J. Super. 60, 77 (App.Div. 1978). Appellants' reliance on State v. Jersey Central Power & Light Co., 69 N.J. 102 (1976), as authority for the proposition that thermal pollution is less harmful than other forms of pollution is misplaced. It was there held only that the discharge of water by an electric utility did not constitute dumping of "debris, hazardous, deleterious, destructive or poisonous substances" within the meaning of N.J.S.A. 23:5-28. However, N.J.S.A. 58:10A-3n, which was enacted after the date of that opinion, specifically includes "thermal waste" within its definition of "pollutant." As to appellants' claim of error in DEP's calculation of a credit for 1981-82 we find the agency's determination to be supported by substantial competent evidence. Close v. Kordulak Bros., 44 N.J. 589, 599 (1965).
Reversed in part, affirmed in part.
*686 JOELSON, J.A.D., dissenting.
As pointed out in the majority opinion, N.J.S.A. 58:10A-9 requires the Commissioner of Environmental Protection to establish "... reasonable annual administrative fees, which fees shall be based upon and shall not exceed, the estimated costs of processing, monitoring and administering the NJPDES permits." I do not share my colleagues' certainty that the statute should be read so as to refer to the estimated costs "in the aggregate." At any rate, if administratively feasible, a fee schedule based upon the cost of processing, monitoring and administering each individual permittee would be more reasonable and equitable.
We learned at the time of oral argument that DEP has devised and has recently implemented a cost accounting system, and that as a result of this system, DEP can now ascertain the cost of processing, monitoring, and administering the NJPDES permit of each individual permittee. It is, therefore, my opinion that this information which is now in DEP's possession should form the basis for its establishing annual fees grounded upon estimated costs. There is no point in the agency's expending the time and money necessary to achieve a cost accounting system, and then not using it. Absent a drastic change in the nature of a discharger's operation, the empirical data available to DEP for the previous year constitutes a sound basis for its estimate of its costs in the ensuing year. This method not only provides fairness and equity, but will be much less difficult to apply than the method suggested by my colleagues whereby toxicity is factored into the fee structure. Although that method is ideologically unexceptionable, it appears to me to be administratively burdensome, if not impossible, in practice.
This leads to a discussion of those permit fees heretofore collected. In this respect, it should be noted that although it is not clear exactly when DEP's cost accounting system was *687 finally implemented, oral argument indicated that such implementation was only recent. Thus, it appears that until such time as it obtained firm data upon which to ground a more reliable estimate, DEP was justified in adopting N.J.A.C. 7:14A-1.8(c)(3)(ii) which provided that the yearly fee be based on the average daily quantity of whichever of the listed pollutants is discharged in the largest amount. We should not lose sight of the fact that N.J.S.A. 58:10A-9 only requires that annual fees be based on estimated costs. Realistically, until its cost accounting system was in place, DEP had nothing better upon which to make its estimate. Now it does. At oral argument, counsel for appellants emphasized the existence of the cost accounting system. As the majority opinion states, appellants' premise is that "the enabling statute requires that DEP determine its fee structure on a permit-specific cost-related basis." When asked to comment on a suggestion that we confine to the future any determination of invalidity we might make, appellants' counsel fairly and commendably informed us that they were principally interested in the future in order to obtain a more just fee structure for their clients. Under the circumstances, I am of the opinion that we should uphold the fees heretofore charged because DEP made its estimate as well as it could under the circumstances, but that all future fees be related specifically to its cost accounting data.
Additionally, I note a statement in the majority opinion that "[a]mong the choices open to DEP in allocating its costs, of course, is that of charging each permittee an equal share of the expenses." I do not read N.J.S.A. 58:10A-9 as warranting such a conclusion. If the Legislature had wished each permittee to be charged the same amount, it could have easily so provided.
I would affirm as to past permit fees, but with the direction that fees in the future be based annually upon an estimate of costs with relation to the experience of the previous year as revealed by DEP's cost accounting data.