214 N.J. Super. 446 (1986)
519 A.2d 931
GAF CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, APPELLANT,
v.
THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted December 2, 1986.
Decided December 26, 1986.
*448 Before Judges ANTELL, BRODY and LONG.
Hannoch Weisman, attorneys for appellant (Irvin M. Freilich, of counsel and John L. Laskey, on the brief).
W. Cary Edwards, Attorney General of New Jersey, attorney for respondents (James J. Ciancia, Assistant Attorney General, of counsel and Paul H. Schneider, Deputy Attorney General, on the brief).
The opinion of the court is delivered by ANTELL, P.J.A.D.
In Pub. Serv. Elec. & Gas v. Dept. of Env. Prot., 193 N.J. Super. 676 (App.Div. 1984), aff'd 101 N.J. 95 (1985) we *449 found arbitrary a fee schedule for New Jersey Pollutant Discharge Elimination System (NJPDES) permits issued under the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-9, where the permit fees were based solely on the volume of effluent discharged without taking into account the toxicity of the discharge. The foregoing statute required that the fees charged be "reasonable," and because the volume-based formula reflected neither actual permit-specific administrative costs nor the actual environmental hazard presented by the individual discharger we concluded that it was not reasonable and therefore invalid. Our holding was accompanied by the observation that if the regulation did scale the fee structure "proportionally to the degree of harm threatened by the permittee's discharge we would have no difficulty sustaining its validity." 193 N.J. Super. at 682. Expressly refraining from making any suggestion as to what course the agency should follow, we stressed only that the method chosen for distributing the costs of processing, monitoring and administering the discharge permits must be reasonable. Id. at 683.
Within this limitation the choice of a least burdensome, workable system is left to the agency. We only say that any assessment system purportedly geared to the degree of hazard posed by a permittee's discharge which takes into account only volume without regard to toxicity of the discharge is less than reasonable. [Ibid.]
Responding to our decision, on June 17, 1985 the Department of Environmental Protection ("DEP") promulgated amended regulations governing the assessment of NJPDES permit fees. As DEP stated in its summary thereof, "The most significant change in the fee methodology is that the formulas take into account the total quantity of all the pollutants discharged by the permittee and the relative risks associated with the discharge of these pollutants."
Appellant is the holder of a NJPDES permit allowing it to discharge the effluent from its Linden plant into the Arthur Kill. On this appeal it challenges the amended regulation on the ground that the fee schedule bears no relation to the cost of processing, monitoring and administering the NJPDES permits *450 and on the further ground that it is not reasonable. It also asserts (1) that the schedule is unfairly based on data drawn from appellant's effluent in 1983 when the permit fees were based solely on volume of discharged pollutants without regard to toxicity and (2) that the use of a bioassay factor in determining toxicity and calculating the NJPDES fees is arbitrary and unreasonable.
As to appellant's first contention, we restate the holding of Pub. Serv. Elec. & Gas v. Dept. of Env. Prot., supra, that the fee structure need not be determined on a permit-specific cost-related basis. Id. at 681. That determination was affirmed on review by the Supreme Court. 101 N.J. at 95.
Appellant's argument that the fee schedule is unreasonable relies chiefly upon the dramatic effect thereon of weighting by risk factor the volume of pollutants. Whereas under the prior regulations appellant's permit fee for 1983-1984 was $12,610.75, its proposed fee for 1984-1985 is $151,315.82. Appellant points out that total fees assessed to permittees classified as industrial surface water dischargers were $1,676,139, and that of the 529 NJPDES permits 180 are at the minimum assessment of $350. Appellant was assessed the highest fee in that category with Ciba-Geigy Corp. in Toms River being assessed $123,747.47 and Chevron's Perth Amboy Refinery being assessed $87,144.98. A total of 33 dischargers were assessed fees greater than $10,000.
We adhere to the view which we stated in Pub. Serv. Elec. & Gas. v. Dept. of Env. Prot. that "if the challenged regulation did actually scale the fee structure proportionally to the degree of harm threatened by the permittee's discharge we would have no difficulty in sustaining its validity." 193 N.J. Super. at 682. The motivating ideology is that "those who do most to create the injurious conditions which give rise to the need for regulation should fairly bear a greater share of the regulatory costs." Ibid. Although this approach may incidentally motivate the dischargers to reduce the toxicity and volume *451 of their effluent, we do not view this as being a primary purpose of the fee structure as appellant claims. N.J.S.A. 58:10A-9 directs DEP to charge "reasonable annual administrative fees ... based upon ... the estimated cost of processing, monitoring and administering the NJPDES permits." We conclude that a schedule which graduates fees in proportion to the deleterious impact of the permittee's discharge is reasonable within the meaning of the statute.
Appellant's next point is that the 1984-1985 fees are based on 1983 data. In 1983, the permit fees were assessed on the volume-based system without regard to toxicity, a formula subsequently invalidated by us in Public Service. Under that system appellant apparently had no incentive to reduce the toxic content of its effluent and therefore did not do so. It now discovers that its 1983 discharge, under the new formula, generates a much greater fee. It claims that even if it alters the content of its discharge now there will be no reduction in the fee until 1987. Characterizing this result as a penalty for its past actions, which complied with its permit and all DEP regulations, appellant says that if it had been able to forecast in 1983 the formula here under attack it would have altered its effluent in that year.
Obviously, DEP can only use the most recent data it has. Fees cannot be computed on discharges not yet in being and there was no unfairness in utilizing the available data. Moreover, the regulations provide a process for recalculating a fee if a permittee believes it is in error or is based on incorrect data. N.J.A.C. 7:14A-1.8(e)7.
Appellant also challenges use of the "bioassay factor" in the NJPDES industrial discharger's fee calculation on two grounds. First, the bioassay test is not required of all permittees. Second, the test is invalid because the aquatic species used are not indigenous to the Arthur Kill, the body of water that receives appellant's discharge.
*452 The bioassay factor, according to DEP's summary of the amended regulations, is designed to assess the "synergistic and antagonistic effects of the discharge." It is described by DEP in the following way:
Fish are put in water which contains 50% of the discharged effluent and 50% uncontaminated water. If more than half of the fish die within 96 hours, the annual fee assessment is increased; if less than half of the fish die, the annual fee assessment is decreased; if the maximum toxicity standard is just met and exactly 1/2 of the fish die, or in instances where it has been established through the permit process that a bioassay is inapposite and thus no bioassay is required by the underlying NJPDES permit, the fee stays about the same.
From our examination of the record it appears that the fees of only three permittees were increased by application of the bioassay factor: appellant, Ciba-Geigy and Monsanto Corporation. Appellant's bioassay factor is 10, meaning that water need only contain 5% of appellant's discharge in order to kill 1/2 of the fish.
Most facilities are not required to perform bioassays as part of the permit application procedure. However, "major facilities" are required to perform such a test. DEP maintains that bioassay tests are not and should not be required of all applicants because of the substantial expense involved. Thus, the determination as to which permittees must perform a bioassay is made on information stored by DEP, identifying the permittees which discharge effluent of such a nature that the synergistic and antagonistic effects of the discharge is a serious environmental concern. DEP maintains that bioassays are justified only in those circumstances.
While we understand appellant's discomfiture at being singled out as a major facility, our view is that the process by which the selection is made is more appropriate for the technical expertise of the agency than for the lay judgment of a reviewing tribunal. It appears from the record that "[t]he bioassay methodology is the best procedure available to measure the overall environmental toxicity of the discharge," and we are unable to determine that the selective use of the bioassay is administratively unjustified. We defer also to DEP *453 technical expertise in disposing of appellant's claim that the bioassay is invalid. It is not within our competence to dissect the components of what is obviously an extremely complex scientific formula. Morris Cty. v. Skokowski, 86 N.J. 419, 424 (1981); New Jersey Bell Telephone Company v. State, 162 N.J. Super. 60, 77 (App.Div. 1978); In Re Application of Howard Savings Bk., 143 N.J. Super. 1, 11 (App.Div. 1976).
Affirmed.