241 N.J. Super. 145 (1990)
574 A.2d 514
NEW JERSEY CHAPTER OF THE NATIONAL ASSOCIATION OF INDUSTRIAL AND OFFICE PARKS, A NEW JERSEY CORPORATION, APPELLANT,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 7, 1990.
Decided May 10, 1990.
*148 Before Judges KING, SHEBELL and BAIME.
David Samson argued the cause for appellant (Kimmelman, Wolff & Samson, attorneys; Douglas P. Black, Dennis M. Toft and Donna Nance, on the brief).
Carol A. Blasi, Deputy Attorney General, argued the cause for respondent (Michael J. Del Tufo, Attorney General of New Jersey, attorney; Michael R. Clancy, Assistant Attorney General, of counsel; Carol A. Blasi, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
We are again faced with challenges to certain regulations promulgated by the New Jersey Department of Environmental Protection (DEP), in implementing the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30 (the Act or Wetlands Act). Last term we invalidated one such regulation, N.J.A.C. 7:7A-2.7(d)(1) and (2), while upholding several other freshwater wetland regulations and agency practices. See In the Matter of Freshwater Wetlands Protection Act Rules, N.J.A.C. 7:7A-1.1, 238 N.J. Super. 516, 570 A.2d 435 (App.Div. 1989). The Supreme Court also has recently considered the issue of the effective date of certain regulatory restrictions relating to the transition-area provisions of the Act. See In the Matter of the Appeal of Adoption of N.J.A.C. 7:7A-1.4, 118 N.J. 552, 573 A.2d 143 (1990), rev'g 240 N.J. Super. 224, 573 A.2d 162 (App. Div. 1989), on Judge Skillman's dissent.
The appellant here is the New Jersey Chapter of the National Association of Industrial and Office Parks (NAIOP). The appellant challenges four sections of the regulations: (1) N.J.A.C. *149 7:7A-2.7(d)(1) and (2), which exempt certain preapproved preliminary site plans or subdivision applications from the statutory requirement of a freshwater wetlands permit, but deny that exemption to those projects not initiated within five years of the enactment of the Act; (2) N.J.A.C. 7:7A-1.6(e), which subjects projects exempted under the Act or regulations to the requirements of other applicable permit programs which existed on June 30, 1988; (3) N.J.A.C. 7:7A-1.4, which defines the "placing of obstructions" in freshwater wetlands; and (4) N.J.A.C. 7:7A-14.1(d) and N.J.A.C. 7:7A-14.2(a)3, which concern creation and enhancement mitigation ratios.
In July 1987 the Legislature enacted the Fresh Water Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30; L. 1987, c. 156, eff. July 1, 1988. N.J.S.A. 13:9B-25 directed the DEP to adopt rules and regulations necessary to implement the Act pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15. On December 31, 1987 the DEP published proposed regulations, held public hearings, entertained and responded to public comment and made some changes in the proposed rules and regulations. 20 N.J.R. 1236-1263. Final regulations were published, to be effective June 6, 1988. 20 N.J.R. 1263-1285. This appeal followed.
Last term, as noted, we found meritorious a challenge to N.J.A.C. 7:7A-2.7(d)(1) and (2) which was similar to appellant's first point on this appeal in In The Matter of the Freshwater Wetlands Protection Act Rules, 238 N.J. Super. 516, 570 A.2d 435 (App.Div. 1989). We adhere to that ruling today.
In our prior opinion, we extensively reviewed the history and purpose of the Act. See 238 N.J. Super. at 518-524, 570 A.2d 435. We also reviewed the general principles applicable to judicial review of a regulatory scheme. Id. at 525-527, 570 A.2d 435. Since we need not reiterate these matters, we move directly to a consideration of the three remaining viable regulatory challenges presented by appellant NAIOP in this case.

*150 I
Appellant NAIOP contends that N.J.A.C. 7:7A-1.6(e) should be invalidated as an ultra vires or unauthorized action by the DEP. Appellant claims that the regulation violates the Legislature's mandate that the Act be the sole program for freshwater regulation and that it effectively eliminates the "grandfather" exemptions given by the Legislature to particular projects by allowing the DEP to regulate wetlands aspects of those projects through other programs. The State replies that the regulation appropriately implements the statutory directive to consolidate the processing of the wetlands-related aspects of other regulatory programs and that there is no suggestion in the Act that it was intended to repeal any of the other programs which bear on the regulation of freshwater wetlands.
N.J.A.C. 7:7A-1.6 deals with "other statutes and regulations" as they relate to the Freshwater Wetlands Protection Act. Appellant specifically challenges subsection (e), which provides that:
If a proposed project does not involve a freshwater wetland or State open water, does not constitute a regulated activity, or is otherwise exempt from the provisions of the Act and this chapter, the final decision on the application shall be based solely on the requirements of other applicable permit programs. For projects exempted under the Act and this chapter's wetlands requirements under N.J.A.C. 7:7A-2.7(d) or (g), the final decision on the application will be based on the requirements of other applicable permit programs as they existed on June 30, 1988. [N.J.A.C. 7:7A-1.6(e).]
Appellant contends that this regulation clashes with N.J.S.A. 13:9B-30, which is captioned "Exclusive regulation by this act; exception." That statute provides:
It is the intent of the Legislature that the program established by this act for the regulation of freshwater wetlands constitute the only program for this regulation in the State except to the extent that these areas are regulated consistent with the provisions of section 6 of this act. [Hackensack Meadowlands Development Commission and Pinelands Commission exemptions.] To this end no municipality, county, or political subdivision thereof, shall enact, subsequent to the effective date of this act, any law, ordinance, or rules or regulations regulating freshwater wetlands, and further, this act, on and subsequent to its effective date, shall supersede any law or ordinance regulating freshwater wetlands enacted prior to the effective date of this act. Between *151 the enactment and effective date of this act, no municipality, county, or political subdivision thereof shall enact any law, ordinance, or rule and regulation requiring a transition area adjacent to a freshwater wetland; provided however, that any such law, ordinance, or rule and regulation adopted prior to the enactment of this act shall be valid until the effective date of this act.
Appellant argues that despite this express statutory direction from the Legislature, N.J.A.C. 7:7A-1.6(e) allows the DEP to "improperly ... regulate projects exempt from the act under the wetlands-related review standards of other N.J.D.E.P. permit programs." A similar challenge to the regulation was made during the adoption process in Comment 91. The DEP noted that six commentors had alleged that N.J.A.C. 7:7A-1.6(e) was contrary to N.J.S.A. 13:9B-5 (consolidation of other regulatory programs affecting wetlands) and N.J.S.A. 13:9B-30 because it allowed the DEP to continue enforcing preexisting regulatory programs that affected activities in wetlands. The commentors contended that the regulation "should require consolidation of all freshwater wetlands rules within one entity which applied to freshwater wetlands." The DEP responded as follows:
The act requires consolidation of the processing of freshwater wetlands-related aspects of other regulatory programs. The rules consolidate wetlands-related aspects of State regulatory programs by providing "one-stop" permitting, through the Office of Freshwater Wetlands within the Division of Coastal Resources. The adoption has been modified to clarify that these other programs will not regulate based on freshwater wetlands protection issues but rather based on concerns addressed in their respective enabling statutes and rules. However, if a project is exempted from the requirements of the act under an exemption pursuant to N.J.A.C. 7:7A-2.7(d), the wetlands-related review standards of other programs will still apply to the project. This effectively carries out the act's mandate to consolidate, as well as to protect wetlands.
Comment 92 indicated that two other commentors had criticized the regulation as being unclear. These commentors argued that if the DEP intended to notify people that they still had to comply with the provisions of other permit programs, the regulations should so state and the specific programs should be identified. The commentors, though, were not in favor of continuing regulation of wetlands under other permit programs. To this criticism the DEP responded:

*152 As explained above, and clarified in the adoption, the permit process has been consolidated so that applicants need not deal with several different review processes for wetlands protection-related permit applications for projects in freshwater wetlands. Other state programs, which regulate activities based on non-wetlands-related concerns (for example, flood danger) will remain in effect. However, these other State programs will consider the impacts on wetlands only if the activity is exempted under the provisions of N.J.A.C. 7:7A-2.7(d).
In its brief the DEP contends that N.J.A.C. 7:7A-1.6(e) is entirely consistent with and implements N.J.S.A. 13:9B-5, which directs the DEP to consolidate the processing of wetlands-related aspects of other regulatory programs affecting activities in freshwater wetlands. The DEP argues that the Legislature did not intend the Wetlands Act to supercede or preempt other state statutory schemes that also regulate wetlands. The DEP also claims that appellant's reliance on N.J.S.A. 13:9B-30 is misplaced because that provision mandates the preemption of local regulation of freshwater wetlands only, not State enactments.
The Legislature made no reference to supersession or preemption in N.J.S.A. 13:9B-5(a)[1] when it directed the DEP to consolidate the processing of wetlands-related aspects of other regulatory programs affecting freshwater wetlands. However, it used precise terminology to that effect in N.J.S.A. 13:9B-30  "this act ... shall supersede any law or ordinance regulating *153 freshwater wetlands enacted prior to the effective date of this act." We reject the DEP's claim that § 30 refers only to local enactments regulating freshwater wetlands. That contention ignores a critical phrase in the statute.
In N.J.S.A. 13:9B-30 the Legislature made plain its "intent ... that the program established by this act for the regulation of freshwater wetlands constitute the only program for this regulation in this State except ..." those wetlands regulated by the Hackensack Meadowlands Development Commission and the Pinelands Commission as set out in N.J.S.A. 13:9B-6. (Emphasis added.) In the next sentence the Legislature prohibited municipalities, counties or political subdivisions thereof from enacting rules or regulations regulating freshwater wetlands after the effective date of the act. But in that very same sentence, the Legislature went on to provide: "... and further, this act, on and subsequent to its effective date, shall supercede any law or ordinance regulating freshwater wetlands enacted prior to the effective date of this act." (Emphasis added.) In using the phrase "any law," the Legislature did not limit its supersession directive to laws enacted by municipalities, counties or political subdivisions thereof, as it had in the first part of that sentence. That the Legislature continued the sentence, prohibiting local legislation after the effective date of this act, by using the phrase "and further ...," demonstrates that not only did it intend that no local government could regulate freshwater wetlands, but also that no preexisting law of any kind could be deemed effective to regulate freshwater wetlands after the Act took effect. We think the DEP reads this statute too narrowly when it concludes that the Legislature intended that the Freshwater Wetlands Protection Act supersede or preempt only local laws and ordinances regulating freshwater wetlands.
We next must decide exactly what the Legislature meant when it used the phrase "constitute the only program" for regulating freshwater wetlands in the first sentence of § 30. *154 Was it referring to laws designed specifically to regulate freshwater wetlands or was it referring to any laws which even incidentally operate upon freshwater wetlands? Statutes such as the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20; the Water Quality Planning Act, N.J.S.A. 58:11A-1 to -11; the Flood Hazard Area Control Act, N.J.S.A., 58:16A-50 to -66; and the Coastal Area Facilities Review Act, N.J.S.A. 13:19-1 to -21, were not designed specifically to regulate wetlands. Nevertheless, they may do so incidentally in the course of implementating their function or purpose. But they were not enacted purposely to regulate freshwater wetlands per se.
The DEP seemed to recognize this problem when it adopted N.J.A.C. 7:7A-1.6(d), which immediately precedes the challenged subsection (e) here under review. N.J.A.C. 7:7A-1.6(d) provides:
This chapter shall not preempt pre-existing State regulatory programs which affect regulated activities in freshwater wetlands including but not limited to [the] Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 et seq., the Flood Hazard Area Control Act, N.J.S.A. 58:16A-50 et seq. and State approved municipal water quality management plans. These programs will continue to regulate based on the concerns covered by their respective enabling statutes and rules, and may, through such regulation, have some impact on projects in freshwater wetlands. However, except pursuant to (e) [N.J.A.C. 7:7A-1.6(e)] below, those programs will not use freshwater wetlands concerns as a basis for regulation, and any such regulation by these programs of projects in freshwater wetlands will be limited to that based on other (for example, flood danger) concerns.
We must recall that in N.J.A.C. 7:7A-1.6(e), the DEP made applications for projects exempted from freshwater wetland permit and transition area requirements subject to "the requirements of other applicable permit programs as they existed on June 30, 1988." What the DEP tried to do in subsection (e), in our opinion, was make those projects, which the Legislature had removed from the Act's regulatory requirements, subject to such regulation as all wetlands had been subjected to prior to passage of the Act. To the extent that such regulation permits statutes which existed before the Act to regulate freshwater wetlands after the effective date of the Act, that regulation *155 violates the Legislature's intent to the contrary expressed in N.J.S.A. 13:9B-30. The Legislature made it abundantly clear in our view, that those preexisting laws were superseded by the Act to the extent that they regulated freshwater wetlands as freshwater wetlands.
The legislative declarations and the statutory language unquestionably evince the Legislature's desire that freshwater wetlands be regulated under a unitary program rather than through myriad other statutory programs preexisting the Act which were not designed to regulate freshwater wetlands specifically as freshwater wetlands. N.J.S.A. 13:9B-2;[2]N.J.S.A. *156 13:9B-30. The DEP was directed to consolidate all of those regulatory programs which had previously regulated activities in freshwater wetlands, into a single permitting process (N.J.S.A. 13:9B-5(a)). N.J.S.A. 13:9B-30 states that the Act is to supersede "any law" which had been regulating freshwater wetlands prior to the effective date of the Act. We note, however, that the Legislature directed that the Act would "supersede," not actually "repeal" such preexisting statutes.
At this point the formal regulatory scheme, of necessity, blurs. We do not think that the Legislature intended that the DEP or any other regulatory body ignore such considerations as water pollution control, flood hazard control, water quality planning, or coastal area concerns. Nor do we think that the Legislature intended that these latter considerations should prevail exclusively to the extent that they trample upon or submerge wetlands considerations whenever their recognition impinges on legitimate wetlands concerns.
We conclude that where a regulation or statute, other than the Wetlands Act or its regulatory progeny, purports to regulate a freshwater wetland based upon "wetland" concerns alone, it has been superseded by the Wetlands Act. Where another regulation or statute has merely a tangential or ancillary effect upon a wetland and is predicated upon a different regulatory concern, be it water quality, flood control, pollution, or whatever, we do not believe the Legislature intended to render the other concern meaningless. Admittedly, recognizing and harmonizing these overlapping regulatory concerns cannot be reduced, in advance, to a precise formula which can be easily *157 applied to each situation that arises. The DEP will no doubt have to harmonize these regulatory interests when considering applications both within and outside the Wetlands program. Suffice it for us to say that the DEP has no power under the Wetlands Act to regulate any wetlands aspects of exempt programs through other State permit programs. Wetlands regulatory aspects may only be administered under the Wetlands Act. However, the DEP must, of course, operate the other state permit programs effectively and conscientiously in pursuit of each program's statutory mandate; if such operation implicates wetlands aspects of these programs incidentally, we see no inexorable conflict. Each program has a primary goal. But harmony of administration with proper respect for property rights is the object, not sharply balkanized or insular programs. We agree with appellant's contention, to the extent that N.J.A.C. 7:7A-1.6(e) is valid only if construed to mean that wetlands regulatory considerations are not to be used when evaluating permit programs submitted under other acts. Wetlands regulation may occur only under the Wetlands Act and its derivative regulations.[3] Wetlands regulations cannot be transported *158 into other permit programs or revived for application thereunder if they are still on the regulatory books pertinent to those programs. In view of the abstract nature of the concerns raised in objection to N.J.A.C. 7:7A-1.6(e), we regret that more precision is not possible. Without context, we realize that the proposition is at best, still theoretical.

II
Appellant next contends that N.J.A.C. 7:7A-1.4, which defines the regulated activity of "placing obstructions," is invalid because it permits the DEP to regulate activities outside the freshwater wetlands.
N.J.S.A. 13:9B-3 defines a regulated activity as meaning "any of the following activities in a freshwater wetland: ... (5) The placing of obstructions;...." (Emphasis supplied.) N.J.A.C. 7:7A-2.3 parrots the statutory language when it sets out the activities regulated by the Act. Subsection (a) provides that "[t]he following activities in a freshwater wetland are regulated pursuant to the Act and are subject to the requirements of this chapter as set forth in N.J.A.C. 7:7A-2.2: ... (5) The placing of obstructions;...." (Emphasis added.) "Placing of obstructions" is defined as meaning "to deposit, construct, install or otherwise situate any obstacle which will affect the values or functions of a freshwater wetland." N.J.A.C. 7:7A-1.4.
Appellant claims that the definition of "placing of obstructions" can be read to mean that the DEP can regulate obstructions placed outside of a freshwater wetland, since there is no limiting language. We conclude that the definition of "placing of obstructions" cannot be read apart from the particular *159 regulation which defines the regulated activity, N.J.A.C. 7:7A-2.3(a). That regulation, and the authorizing statute, clearly state that the activities which are regulated must occur "in a freshwater wetland."
The Act specifically describes "regulated activities" as those "in a freshwater wetland" only. N.J.S.A. 13:9B-3. As we read this pertinent section and the regulation derived from it, N.J.A.C., 7:7A-2.2, no express attempt has been made to regulate activities outside the wetlands. The definition of "placing of obstructions," N.J.A.C. 7:7A-1.4, must be read with that basic statutory grant of power in mind; the definition is meaningful only within the framework of the regulated activity described. Context is controlling. Indeed the DEP does not here contend that it has the "implied" power under the Act to regulate the "placing of obstructions" outside freshwater wetlands. DEP concedes the limitation in its brief at page 27, stating: "contrary to appellant's contention, and by express terms of the regulation, only obstructions placed `in a freshwater wetland' will be regulated." Thus, we need not consider here if the DEP has any implied power under the Act over obstructions not in a freshwater wetland in order to effectuate its statutory purpose to protect wetlands. See N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978). That question is not before us.

III
Appellant contends that the regulatory requirements setting fixed acreage ratios for mitigating adverse environmental impacts, N.J.A.C. 7:7A-14.1(d), and N.J.A.C. 7:7A-14.2(a)(3), are invalid for two reasons: they conflict with the statutory language of N.J.S.A. 13:9B-13a and b, and the fixed ratios have no support in the record.
N.J.S.A. 13:9B-13b permits the DEP to
... require the creation or restoration of an area of freshwater wetlands of equal ecological value to those which will be lost, and [the DEP] shall *160 determine whether the creation or restoration of freshwater wetlands is conducted onsite or offsite. The department shall accept and evaluate a proposal to create or restore an area of freshwater wetlands only after the department has evaluated the permit application for which the proposal is made, and shall evaluate the proposal to create or restore an area of freshwater wetlands independently of the permit application. The department's evaluation of a proposal to create or restore an area of freshwater wetlands shall be conducted in consultation with the United States Environmental Protection Agency.
The "equal ecological value" standard is no doubt our Legislature's expression for the "no-net-loss" of wetlands principle which is gaining currency nationally.[4]
The regulations adopted pursuant to § 13b generally require "all appropriate measures to mitigate adverse environmental impact" on the wetlands, N.J.A.C. 7:7A-14.1(a), and "compensation" for disturbance and loss, by replacement of wetlands of "equal ecological value." N.J.A.C. 7:7A-14.1(b). Subchapter 14 of the regulations deals with the mitigation requirement generally. N.J.A.C. 7:7A-14.2(a) sets out four different types of mitigation which can be required by the DEP: restoration, creation, enhancement and contribution. The two regulations in this subchapter that are challenged here set out acreage ratios for mitigation by creation and enhancement. N.J.A.C. 7:7A-14.1(d) provides:
Where the Department permits mitigation on less than a 2:1 basis, frequent monitoring will be required by the permittee. In such cases, the Department will require additional mitigation or further remedial action when a net loss of equal ecological value is indicated. Under no circumstances shall the mitigation area be smaller than the disturbed area. Creation of wetlands from other existing climax habitats is discouraged.[5]
*161 Also pertinent to this appeal is the category of mitigation called "enhancement," which is described in the regulations as follows:
Enhancement refers to actions performed to improve the characteristics, habitat and functions of an existing, degraded wetland such that the enhanced wetland will ... have resource values and functions similar to an undisturbed wetland. Enhancement will be required at a ratio of seven acres enhanced to one acre lost or disturbed. [N.J.A.C. 7:7A-14.2(a)3.]
Appellant contends that these regulations, with fixed acreage ratios, violate the statutory directive that the amount of mitigation area be of "equal ecological value to those which will be lost." See N.J.S.A. 13:9B-13b. Since the statute requires an ecological value determination of the quality of the acres disturbed, appellant claims that the DEP is out of line in setting mitigation requirements based upon acreage alone. Appellant contends that these ratios are not based on any scientific evidence in the record or elsewhere and must be deemed arbitrary and unreasonable. Appellant scoffs at the DEP's suggestion that its ratios may be rebutted on a case-by-case basis, arguing that such rebuttal is "difficult," very "costly," and quite impractical.
The DEP responds that appellant is misreading the statute and the regulations when it charges that the ratios are absolute, unrebuttable and bear no relationship to the ecological value of the wetlands disturbed by development. The DEP also claims that its ratios are supported by the evidence in the record.
The DEP's response on appeal is similar to that found in its comments on the regulations made during the adoption process. The DEP noted that four commentors had claimed that the simple acreage ratios were arbitrary in light of the statutory direction that the extent of the required mitigation should be based upon a determination of equal ecological value, not *162 simply land area. Comment 423. The DEP responded to that comment in this way:
Past data from the coastal zone management program suggests that mitigation at a 2:1 ratio generally provides equal ecological value and compensates for ecological losses over time. In addition, it provides a predictable, efficient, and equitable standard for applicants to follow in planning. The rule does, however, allow for mitigation at less than a 2:1 ratio, provided that an applicant can demonstrate to the department's satisfaction that a lesser area of mitigation will result in wetlands of equal ecological value. (See N.J.A.C. 7:7A-14.2a.) These demonstrations, however, are often costly and time consuming for both the applicant and the department and are therefore optional.
To another Commentor (Comment 429) who claimed that equal ecological value and functions should be measured by the makeup of the wetland, the DEP responded;
These types of considerations will enter into department evaluation of mitigation proposals, and department determinations of ecological value in cases under N.J.A.C. 7:7A-14.2a, where an applicant chooses to demonstrate equal ecological value. The department's experience, however, has shown that the ratio approach to mitigating wetlands losses is also environmentally sound and workable, and provides an acceptable baseline for determinations of equal ecological value.
We cannot agree with appellant's claim that the use of acreage mitigation ratios automatically violates the statute. There is nothing within the Act that may be construed to prohibit the DEP's implementation of a fixed acreage ratio for mitigation purposes. The ratios may be used as long as they can be reasonably equated to the standard enunciated in the statute: "equal ecological value." The regulations make it clear that the ratios are not fixed and absolute but are simply options available to the DEP and the permittee. The regulations clearly provide the permittee with the option to prove "that by restoring or creating a lesser area, there will be a replacement of wetlands of equal ecological value." N.J.A.C. 7:7A-14.1(b). To this, appellant responds that the very adoption of ratios creates, in effect, an irrational though rebuttable regulatory presumption, and that the permittee's cost and burden of rebutting the presumption is unreasonably high.
The difficult question for us to decide is whether those 2:1 and 7:1 ratios reflect a scientific determination that their *163 use will result in the creation or replacement of wetlands of equal ecological value. We note at the outset that the 7:1 enhancement ratio is not referred to in any of the scientific literature which the parties have submitted on this appeal. Comment 428 challenged the 7:1 enhancement ratio requirement as arbitrary and a formidable discouragement to a developer's use of enhancement as a mitigation option. The DEP responded:
The act allows the department to require the creation of new freshwater wetlands or the enhancement of degraded freshwater wetlands. The latter option, since it involves improvement of already existing wetlands, results in a loss of wetlands values and functions in this State. Thus, more wetlands must be enhanced to compensate on the basis of equal ecological value for wetlands lost to the ecosystem. The department therefore has determined that a higher enhancement ratio was warranted to replace the total ecological value lost.
Obviously, this response provides no scientific justification for the DEP's decision to use a 7:1 ratio rather than some lesser or greater ratio. In its brief the DEP contends that the coastal zone management program data in support of the 2:1 ratio for creation mitigation in general is equally applicable to the 7:1 ratio for enhancement. But there is nothing in this record which specifically refers to or supports the 7:1 enhancement ratio. There is no way to determine the precise basis for the DEP's choice of 7:1 as an appropriate requirement for enhancement mitigation. At this point, it appears to be no more than a regulatory guess.
There has been only one scientific study done on freshwater wetlands mitigation: "Evaluation of Artificial Salt Marshes in New Jersey," by Joseph K. Shisler and David J. Charette (1984), sponsored by the Division of Coastal Resources. Without waxing too technical, the conclusion of this study is that natural wetlands have a much higher productivity of vegetation and macroinvertebrate species than artificially created wetlands. Further, the sediment characteristics of artificial marshes are very different from those found in natural marshes. For that reason the study suggested that artificial marsh size should be greater than a 1:1 ratio to replicate natural marshes. *164 Clifford Day, Field Supervisor from the United States Department of the Interior, Fish and Wildlife Service also agreed in a report to the DEP dated October 14, 1987, that if studies were to show that artificially created wetlands had only half as much ecological value as natural wetlands, twice as much artificial wetland should be required in creation mitigation. He stated: "We recommend this as an interim approach until the mitigation element can begin to understand and correct any value discrepancy between artificial and natural wetlands."
The scientific evidence is hardly overwhelming; there is naturally a dearth of scientific literature on the topic because mitigation projects are new and largely experimental. Here is the thrust of the literature submitted by the DEP in this record. A National Wetlands' Policy Forum: Mitigation Policy Background Paper (1988), indicated that, where mitigation is intended to compensate for lost wetland values, with a goal toward increasing wetlands inventory, it would necessitate a "more than one for one replacement." The scientific problem is outlined in that "Background Paper" in this way:
A no net loss policy may be based on the physical area lost or the wetland functions and values lost. A no net loss policy may, therefore, imply either a 1:1 replacement of acres lost or a 1:1 replacement of values lost. A goal of increasing the nation's wetlands inventory implies that more than a one for one replacement would occur. But in many cases, neither the alteration nor the compensation may be total. Alterations may result in only partial loss of wetland functions. And compensation may involve enhancing existing wetlands rather than creating new wetlands.
Some states such as Florida have adopted a two-for-one rule  two acres must be restored or created for every acre lost. Current New Jersey policy requires different levels of mitigation (1:1, 2:1, etc.) depending upon whether the proposed mitigation is on- or off-site, and if off-site, whether it is in the same drainage basin as the project causing the mitigation. The federal government is evaluating the use of more sophisticated wetland function and value evaluation the use of more sophisticated wetland function and value evaluation techniques for estimating the appropriate compensation ratio for individual permit applications. These tools attempt to measure the value of the functions provided by both the wetlands being altered and the compensatory wetlands, and base the compensation requirements on the comparison of these functional values.
Although there are dozens of wetland evaluation techniques including "best professional judgment," the most widely used approaches are the FWS Habitat *165 Evaluation Procedures (HEP), which was developed as an impact assessment tool; and the Federal Highway Administration's (FHWA) technique developed by Adamus and Stockwell (1983), which was developed as a planning tool. The Adamus technique is more comprehensive and suitable for regulatory determinations because it accounts for more wetland functions than HEP (Zedler and Kentula, 1985). However, many observers believe that substantially more research and development is needed before such techniques can be used with confidence. The Corps is leading an interagency effort to improve the predictability of the Adamus method, renamed the Wetland Evaluation Technique (WET), and adapt it for use on a personal computer. EPA researchers are focusing their efforts on compiling existing scientific information on how well compensatory wetlands are functioning and the processes that must be considered in developing compensatory wetlands (e.g., succession), and on field evaluation of the functions of created/restored wetlands compared to reference natural wetlands.
We cannot agree with appellant's claim that the 2:1 mitigation ratio has no scientific basis. There is some support for it. Given this court's deference to the administrative agency's expertise in relation to technical matters, Public Service Electric & Gas v. Dept. of Env. Prot., 193 N.J. Super. 676, 684, 475 A.2d 665 (App.Div. 1984), aff'd o.b. 101 N.J. 95, 501 A.2d 125 (1985), we uphold it. This presumption of reasonableness of agency action is even stronger where the agency "has been delegated discretion to determine the specialized and technical procedures for its tasks." Newark v. Natural Resources Coun. Dept. Env. Prot., 82 N.J. 530, 540, 414 A.2d 1304 (1980). While the DEP's interpretation of the data is not binding on us, it is entitled to substantial weight. See Matter of Declaratory Ruling, 234 N.J. Super. 139, 146-147, 560 A.2d 689 (App.Div. 1989); American Cyanamid v. DEP, 231 N.J. Super. 292, 312-313, 555 A.2d 684 (App.Div.), certif. den. 117 N.J. 89, 563 A.2d 847 (1989). The same cannot be said for the 7:1 enhancement ratio. There is simply nothing in this record to indicate why or how the DEP chose that ratio for enhancement mitigation purposes. While we must defer to the agency's expertise, we need not surrender to it.
The enabling Act doubtlessly gives DEP substantial latitude in deciding the appropriate method of mitigation as a condition of a freshwater wetlands permit. The legislative intent was to *166 protect the wetland resource, replacing that which has been lost to development, if possible. N.J.S.A. 13:9B-13. If the DEP can establish that the 7:1 ratio for enhancement is reasonable for a particular project, we would uphold that application of the standard on a case-by-case basis. If at some time in the future, the scientific data reasonably supports the 7:1 enhancement ratio or any other ratio, we could approve a regulation so declaring. On this record, we cannot say that a 7:1 ratio for enhancement "to improve the characteristics, habitat and functions of an existing, degraded wetland" so that it will have "resource values and functions similar to an undisturbed wetland," N.J.A.C. 7:7A-14.2(a)(3), has a reasonable basis in scientific theory. The use of the 7:1 ratio as a fixed or presumptive standard has not been justified. Until an enhancement ratio is scientifically validated, site-specific ratios must be used.
We conclude that N.J.A.C. 7:7A-2.7(d)(1) and (2) and N.J.A.C. 7:7A:14-2(a)(3) (7:1 enhancement ratio) are invalid; we conclude that N.J.A.C. 7:7A-1.6(e), N.J.A.C. 7:7A-14.1(d) and N.J.A.C. 7:7A-1.4 (2:1 creation ratio) are valid, as construed.
Reversed in part; affirmed in part.
NOTES
[1] N.J.S.A. 13:9B-5a states:

13:9B-5. Consolidation of other regulatory programs affecting activities in freshwater wetlands with permit process; permit application; public hearing; issuance or denial; notice; fees
a. The department shall consolidate the processing of wetlands related aspects of other regulatory programs which affect activities in freshwater wetlands, including, but not limited to, sewer extension approvals required pursuant to P.L. 1977, c. 74 (C. 58:10A-1 et seq.) [Water Pollution Control Act], permits required pursuant to P.L. 1973, c. 185 (C. 13:19-1 et seq.) [Coastal Area Facility Review Act], and any permits and approvals required pursuant to P.L. 1977, c. 75 (C. 58:11A-1 et seq.) [Water Quality Planning Act], and P.L. 1962, c. 19 (C. 58:16A-50 et seq.) [Flood Hazard Area Control Act], with the freshwater wetlands permit process established herein so as to provide a timely and coordinated permit process consistent with the Federal Act.
[2] N.J.S.A. 13:9B-2 states:

Legislative findings and declarations
The Legislature finds and declares that freshwater wetlands protect and preserve drinking water supplies by serving to purify surface water and groundwater resources; that freshwater wetlands provide a natural means of flood and storm damage protection, and thereby prevent the loss of life and property through the absorption and storage of water during high runoff periods and the reduction of flood crests; that freshwater wetlands serve as a transition zone between dry land and water courses, thereby retarding soil erosion; that freshwater wetlands provide essential breeding, spawning, nesting, and wintering habitats for a major portion of the State's fish and wildlife, including migrating birds, endangered species, and commercially and recreationally important wildlife; and that freshwater wetlands maintain a critical baseflow to surface waters through the gradual release of stored flood waters and groundwater, particularly during drought periods.
The Legislature further finds and declares that while the State has acted to protect coastal wetlands, it has not, except indirectly, taken equally vigorous action to protect the State's inland waterways and freshwater wetlands; that in order to advance the public interest in a just manner the rights of persons who own or possess real property affected by this act must be fairly recognized and balanced with environmental interests; and that the public benefits arising from the natural functions of freshwater wetlands, and the public harm from freshwater wetland losses, are distinct from and may exceed the private value of wetland areas.
The Legislature therefore determines that in this State, where pressures for commercial and residential development define the pace and pattern of land use, it is in the public interest to establish a program for the systematic review of activities in and around freshwater wetland areas designed to provide predictability in the protection of freshwater wetlands; that it shall be the policy of the State to preserve the purity and integrity of freshwater wetlands from random, unnecessary or undesirable alteration or disturbance; and that to achieve these goals it is important that the State expeditiously assume the freshwater wetlands permit jurisdiction currently exercised by the United States Army Corps of Engineers pursuant to the Federal Act and implementing regulations. L. 1987, c. 156, § 2, eff. July 1, 1988.
[3] The Act defines "freshwater wetland" to mean

an area that is inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation; provided, however, that the department, in designating a wetland, shall use the 3-parameter approach (i.e., hydrology, soils and vegetation) enumerated in the April 1, 1987 interim-final draft "Wetland Identification and Delineation Manual" developed by the United States Environmental Protection Agency, and any subsequent amendments thereof;.... [N.J.S.A. 13:9B-3.]
The Act defines "regulated activity" to mean:
any of the following activities in a freshwater wetland:
(1) The removal, excavation, disturbance or dredging of soil, sand, gravel, or aggregate material of any kind;
(2) The drainage or disturbance of the water level or water table;
(3) The dumping, discharging or filling with any materials;
(4) The driving of pilings;
(5) The placing of obstructions;
(6) The destruction of plant life which would alter the character of a freshwater wetland, including the cutting of trees;.... [N.J.S.A. 13:9B-3.]
These definitions tell us the effective scope of the Act. Anything within these definitions is subject to exclusive regulation by the Wetlands Act.
[4] "Efforts to Halt Wetland Loss Turn Their Attention Inland," New York Times at C 1 (March 13, 1990), stating:

Under the no-net-loss principle, conversion of wetlands would be permitted only if the user restored previously converted wetlands or created new ones. President Bush has embraced it, and two Federal agencies and some state governments are requiring it. Congress is holding hearings about whether it should be Federal Law.
[5] Appellant contends that when "mitigation is to be accomplished by creation of new wetlands, the applicable ratio [imposed by DEP] is two acres for each wetland acre lost or disturbed on account of the project." Brief at 26-27. The use of this creation ratio is attacked by appellant although it otherwise is not set out specifically in the regulations.