243 N.J. Super. 285 (1990)
579 A.2d 343
IN THE MATTER OF VINELAND CHEMICAL COMPANY (VICHEM).
Superior Court of New Jersey, Appellate Division.
Argued June 6, 1990.
Decided August 15, 1990.
*288 Before Judges KING, BAIME and KEEFE.
Gerald W. Ueckermann, Jr., argued the cause for appellant (Greenblatt, Riesenburger & Kizner, attorneys, Gerald W. Ueckermann, Jr. on the brief).
Richard F. Engel, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney, Michael R. Clancy, Assistant Attorney General, of counsel, Richard F. Engel on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
On this appeal, appellant Vineland Chemical Company (ViChem) challenges the New Jersey Department of Environmental Protection's (DEP) denial of a permit to discharge two types of effluent to groundwater. We affirm the final decision of the Commissioner of DEP substantially for the reasons given in his 40-page written opinion of December 21, 1989. We conclude that Commissioner Daggett's decision was consistent with his legal authority and supported by substantial credible evidence in the record.
This is a concise recent procedural history of this matter which spans almost the last two decades. On March 2, 1982 ViChem submitted an application to DEP seeking a New Jersey *289 Pollutant Discharge Elimination System (NJPDES) discharge-to-groundwater permit for two types of effluent. On April 14, 1986 DEP gave public notice of its intent to deny ViChem's application. Public comments were received between April 14 and July 24, 1986 and a public hearing was held on June 23, 1986. On March 23, 1987 DEP issued a final decision denying ViChem's application for a NJPDES permit. On April 24, 1987 ViChem requested an administrative hearing and a stay pending disposition of its appeal from DEP's final decision. On November 2, 1987 DEP denied ViChem's request for a stay. On November 18, 1987 we granted ViChem a stay.
On June 15, 1987 this matter was transmitted to the Office of Administrative Law as a "contested case." Plenary hearings were conducted before an Administrative Law Judge (ALJ) in November and December 1988. On July 10, the ALJ issued his initial decision recommending reversal of DEP's decision to deny ViChem's permit application.
On December 21, 1989, then-Commissioner of DEP Christopher Daggett issued his final decision. He declined to follow the ALJ's recommendation and affirmed DEP's decision to deny ViChem's NJPDES permit requests. On January 22, 1990 ViChem sought a stay of DEP's final decision from then-Acting Commissioner Helen Fenske. On January 23, 1990 ViChem filed a notice of appeal from DEP's final decision.
On March 9, 1990 DEP Commissioner Judith Yaskin denied ViChem's request for a stay pending this appeal. On March 27, 1990 ViChem filed an emergency application with this court seeking a stay pending appeal. This panel heard oral argument on the application for a stay on March 27, 1990. We denied ViChem's request for a stay but accelerated the appeal and scheduled argument for June 6, 1990.
This is a more elaborate background of the matter. For more than 30 years, ViChem has been engaged in the manufacture of organic herbicides and fungicides at its plant in Vineland. The ViChem site consists of about 20 acres. It contains *290 several manufacturing and storage buildings, a laboratory, a workers' changing facility, a wastewater treatment plant, several lined lagoons and several unlined "percolation" lagoons. The lined lagoons are used to store arsenic-contaminated water prior to its treatment and discharge. The unlined percolation lagoons are used to allow discharged water to percolate through the soil down to the water table. In this appeal ViChem challenges DEP's decision not to permit it to discharge two types of effluent into the unlined percolation lagoons.
In the early 1970's ViChem stored waste salts from its production processes in outdoor piles at its manufacturing plant. These waste salts contained 1% to 2% arsenic, which ViChem used in the production of its products. Over time, rain caused the arsenic in the salt piles to leach into the groundwater beneath ViChem's facility. Also during the 1970's ViChem discharged untreated water containing arsenic  referred to as "process waters"  directly into the ground under its plant. These practices resulted in substantial arsenic contamination of the soil and groundwater under ViChem's plant which exists to this day.
The groundwater under the ViChem site is part of the Cohansey-Upper Kirkwood aquifer, also referred to as the shallow or upper aquifer. This groundwater flows into the Blackwater Branch which is a tributary of the Maurice River. From the Maurice River the flow continues into Union Lake. Below the Union Lake Dam the Maurice River continues until it flows into the Delaware River.
Beneath the Cohansey-Upper Kirkwood aquifer is the Lower Kirkwood aquifer, also referred to as the deeper or lower aquifer. The Lower Kirkwood aquifer is used by the City of Vineland for its water supply. A dispute existed between the parties about whether all of the water in the Cohansey-Upper Kirkwood aquifer flows into the Blackwater Branch or whether some of it percolates down to the Lower Kirkwood aquifer. Interestingly, a report prepared by a ViChem consultant, Dr. *291 Lennon, noted: "It is possible that the more contaminated water is taking a much deeper path than was initially believed." This 1982 report concluded that more study was needed to determine the ultimate destination of the arsenic-contaminated water beneath the ViChem site.
Back on February 8, 1971 DEP had issued an order alleging that ViChem was "discharging industrial waste and other polluting matter into the Blackwater Branch of the Maurice River," contrary to N.J.S.A. 58:12-1 and 58:12-3, both since repealed. See L. 1977, c. 74. The order directed ViChem to provide industrial wastewater treatment or disposal facilities in order to dispose of its waste sufficiently, in a manner approved by DEP.
On August 22, 1973 DEP filed a civil complaint against ViChem, alleging that it had failed to comply with the February 8, 1971 order, and seeking injunctive relief and penalties. This action resulted in a judicial consent order in the Chancery Division entered on March 11, 1977. The order required ViChem to take action towards elimination of its waste disposal problems. Because ViChem failed to comply with the terms of the consent order, DEP was forced to obtain an amended order enforcing litigant's rights on July 22, 1977 and another such order on October 2, 1978.
As part of its plan to control the discharge of arsenic from its plant, ViChem proposed to construct a water treatment facility. Before ViChem could construct this facility, it was required to obtain a Treatment Works Approval (TWA) pursuant to N.J.S.A. 58:10A-6b. While the record does not disclose when ViChem first made application for a TWA, it appears that this did not occur until some time after July 22, 1977, the effective date of the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20.
N.J.A.C. 7:14-12.1 to -12.26 established a three-stage approach for obtaining a TWA. Stage I requires an applicant to obtain a conceptual approval of a treatment works. Stage II *292 requires an application to build, install or modify a treatment works. Stage III requires an approval to operate a treatment works. On December 9, 1977 DEP issued ViChem a Stage I conceptual approval of the proposed treatment works. This approval advised ViChem to refer to the rules under the New Jersey Water Pollution Control Act, (N.J.S.A. 58:10A-1 to -20) in preparing its Stage II application. By letter dated December 20, 1978 DEP expressed its intent to issue ViChem a Stage II approval but noted that ViChem's plans and engineer's report failed to "sufficiently demonstrate that the State requirement for a maximum [arsenic] concentration of .05 mg/l [N.J.A.C. 7:9-6.6] will be routinely achieved."[1] This letter warned that ViChem would be required to install additional treatment equipment if its proposed waste treatment facility could not attain compliance with this State's effluent standard.
On January 30, 1979 DEP issued ViChem a Stage II and Stage III TWA which authorized it to construct and operate the proposed waste treatment facility. This approval stated that the treatment facility would be permitted to discharge treated effluent at the rate of 36,000 gallons per day (gpd) into ViChem's unlined percolation lagoons. ViChem asserts that its TWA approval also permitted it to discharge 150,000 gpd, later increased to 200,000 gpd, uncontaminated noncontact cooling water.[2] DEP's approval again cautioned that ViChem's proposed facility must "produce an effluent of such a nature as to protect the quality of the receiving waters in accordance with the current rules of [DEP] and the Delaware River Basin Commission." The approval specified that all waters discharged *293 into ViChem's unlined percolation lagoons should not contain more than 0.05 mg/l arsenic, the then-prevailing potable water standard of DEP and the U.S. Public Health Service.
In March 1980 ViChem's waste treatment facility became operational. Quickly it became apparent that ViChem failed to meet DEP's 0.05 mg/l standard for arsenic discharges to groundwater. N.J.A.C. 7:9-6.6. According to a report prepared by ViChem, the 0.05 mg/l standard could not be achieved consistently by currently available methods. This report concluded that current technology enabled it to reduce arsenic concentration to between .05 mg/l and 1 mg/l. As a result, ViChem requested that DEP waive its 0.05 mg/l arsenic standard. On December 18, 1980 DEP rejected ViChem's waiver request and advised it to "diligently pursue [other] treatment processes in order to obviate any need for further adversarial proceedings to mandate same."
By letter dated March 16, 1981 ViChem stated:
We have found in our waste water treatment plant that we can achieve the desired range of inorganic arsenic required by state regulation. However, the less toxic methyl arsonic acid is reduced (using the best attainable technology) to about 0.5 ppm. Because of the great stability of the compound, its rapid dilution by natural waters and its relatively low toxicity compared to inorganic arsenic we respectfully request that the treatment works as presently operated be approved for a continuing interim basis. Meanwhile we will as we have, for a decade, continue our research to reduce all arsenic effluent to less than .05 ppm.
Subsequent correspondence between DEP and ViChem dwelt upon and established ViChem's position that a regulatory distinction should be drawn between organic and inorganic forms of arsenic. ViChem maintained that the organic form is "far less toxic than the inorganic form" and that the arsenic at its site was and is predominately organic. In a letter of September 2, 1981 ViChem asserted that it could only be held to the .05 mg/l federal EPA arsenic standard which had recently been *294 amended to apply to the inorganic form only.[3] ViChem claimed that it had met that standard of .05 mg/l as to inorganic arsenic.
DEP refused to change its position with regard to requiring that ViChem's treatment-plant effluent contain no more than .05 mg/l total arsenic, a standard with which ViChem never complied. On July 16, 1981 ViChem requested an administrative hearing contesting DEP's arsenic effluent standard as applied to it. On December 22, 1981 the July 16 initiative by ViChem was settled by entry of an administrative consent order (ACO). The ACO, among other things, provided:
11. ViChem shall continue to investigate treatment alternatives to meet the effluent limit of 0.05 mg/l [arsenic] as proposed in ViChem's submittal dated July 13, 1981. To determine the effectiveness of each proposal, speciation will be conducted during the study on the treatment plant influent used in the bench scale tests. Monthly progress reports will be submitted to NJDEP for a period of three (3) months; then a final report of the study must be submitted within four (4) months from the effective date of this Consent Order.
12. While the proposed experimental testing is being conducted and until such time as a decision is made by NJDEP on the achievability of 0.05 mg/l effluent limit, ViChem may only discharge its treated water into the unlined lagoon at a level of total arsenic concentration of not more than 0.7 mg/l.
The ACO also stated that ViChem did not waive its right to challenge DEP's arsenic concentration standard in the future. In a covering letter accompanying the ACO sent to ViChem's counsel, DEP stated:
... Please be advised that the "standard" of 0.7 mg/l, as stated in paragraph 12, is only an interim standard which must be met as of the effective date of this Order. As stated in paragraphs 11 and 12 of the Order, once ViChem submits its final report on treatment alternatives and NJDEP reviews said submittal a final determination on the level of arsenic which can be discharged will be made and both parties reserved their respective rights concerning the setting of said standard.
On March 6, 1981 DEP, pursuant to the Water Pollution Control Act of 1977 (WPCA or Act), N.J.S.A. 58:10A-1 to -20; L. 1977, c. 74, enacted regulations implementing the New Jersey *295 Pollutant Discharge Elimination System (NJPDES), N.J.A.C. 7:14-1 to -14.8. The NJPDES was implemented to forbid the discharge of pollutants to water without a permit issued by the Commissioner of DEP or the Administrator of the EPA. N.J.S.A. 58:10A-6a. See In the Matter of the Issuance of a Permit by the Department of Environmental Protection to Ciba-Geigy Corporation, 120 N.J. 164, 169-170, 576 A.2d 784 (1990). On March 2, 1982 ViChem applied to DEP for an NJPDES permit to discharge 36,000 gpd of treatment plant effluent and also a permit to discharge 200,000 gpd of noncontact cooling water. Following submission of its application, ViChem heard nothing from DEP until January 17, 1984 when, according to ViChem, DEP informed it that the NJPDES permits would soon be issued.
On April 14, 1986 DEP publically noticed its intent to deny ViChem's NJPDES permit applications. Following a public hearing and comment period, on March 23, 1987 DEP issued its decision to deny both NJPDES permits requested by ViChem. DEP gave these reasons for its 1987 decision:
1. Vineland Chemical Co. withdraws water from the Kirkwood formation at a depth of 135 feet below ground surface. The 200,000 GPD of groundwater that is withdrawn from the Kirkwood formation is circulated through the facility's cooling system (where it has the potential to become contaminated in the event of an upset) and is then discharged directly to the series of three unlined infiltration/percolation lagoons. This discharge is monitored continuously for specific conductance. In the event of an upset that causes conductivity to exceed 1000 umhos/cm (indicating the presence of pollutants in the cooling water), an alarm would sound and the cooling water would be directed to the lined hazardous waste surface impoundments for storage and subsequent treatment prior to discharge.
The 200,000 GPD is being discharged by means of infiltration/percolation into the Cohansey aquifer, which is already highly contaminated with arsenic (and possibly other compounds) as a result of past practices at the facility. These past practices included improper storage of waste piles (arsenic salts) that were left uncovered, thereby allowing the highly soluble arsenic to percolate into the soil and groundwater.
At present, the discharge of 200,000 GPD into the Cohansey aquifer represents a substantial threat to public health, safety and the environment. The NJDEP has reviewed existing groundwater quality data in addition to the new data submitted by Vineland Chemical Co. as part of its hazardous waste facility application and has determined that this discharge is exacerbating the contamination *296 on-site and off-site by increasing hydraulic gradients (both horizontally and vertically). The effect of these increased gradients is to increase the rate of groundwater flow off-site and into Blackwater Branch, the Maurice River and Union Lake. Additionally, this discharge may be causing the existing plume of contamination to move deeper within the Cohansey aquifer which may be hydraulically connected to the deeper Kirkwood aquifer. The cooling water discharge also directly increases both the volume and the rate of pollutants discharging from the Cohansey aquifer into the Blackwater Branch, which is already heavily contaminated.
2. The second existing discharge at this facility consists of approximately 36,000 GPD of treated effluent from an on-site wastewater treatment plant that is subject to IWMF permit-by-rule pursuant to N.J.A.C. 7:14A-4. The 36,000 GPD consists of approximately 25,000 GPD of treated groundwater (from the Cohansey formation) and unknown quantities of treated process water and treated stormwater runoff.
The facility is currently allowed to discharge at concentrations up to and including 0.7 mg/l of arsenic pursuant to a Dec. 22, 1981 Administrative Consent Order entered into between the NJDEP and Vineland Chemical Co. The 0.7 mg/l concentration was considered to be an interim standard pending completion of treatability studies by the facility and a final decision based on all available evidence supporting the facility's request for a waiver from the applicable groundwater protection standard for arsenic (which is 0.05 mg/l). The basis for denial of the NJPDES permit for the discharges is the facility's inability to meet the acceptable discharge limitation of 0.05 mg/l for arsenic. The limitation of 0.05 mg/l arsenic is a groundwater quality based limitation and is based on maximum contaminant levels established under the Safe Drinking Water Act of 1977 (33 U.S.C.A. 1251 et seq). Additionally, arsenic is a "toxic pollutant" pursuant to N.J.A.C. 7:9-6.1 et seq for which the primary standard in Class GW-2 groundwater is 0.05 mg/l. The existing discharges at this facility are into the Cohansey/Upper Kirkwood aquifers which have a natural Total Dissolved Solids concentration which is less than or equal to 500 mg/1 and represents Class GW-2 groundwater. Hence, any discharge at this facility that exceeds the groundwater quality based limitation of 0.05 mg/l would result in continued and cumulative degradation of ground and surface waters that would constitute a threat to public health and safety and would certainly interfere with the present and potential use of groundwater in the Cohansey/Upper Kirkwood aquifer.
ViChem challenged DEP's permit denial before the ALJ at an OAL hearing. Following that hearing, the ALJ rendered his initial decision. He found that DEP's decision not to permit ViChem to discharge 200,000 gpd noncontact cooling water, because discharge would "constitute a substantial threat to public health, safety and the environment," was "without evidentiary support." He also found that the arsenic contained in *297 the groundwater under ViChem's plant would continue to discharge into the Blackwater Branch even if the discharge of noncontact cooling water were terminated. He noted DEP's concession that "the mere stopping of the discharges that are the subject of this proceeding will not, in and of itself, significantly improve the existing water quality in the Blackwater Branch." With respect to DEP's claim that the noncontact cooling water may be causing the existing groundwater contamination "to be moving deeper within the [Cohansey/Upper Kirkwood] aquifer which may be hydraulically connected to the deeper Kirkwood aquifer," the judge said that such "threat appeared to be suppositious rather than real and hypothetical rather than proven." He also stated that there was "no competent evidence in the record that the upper and deeper aquifers are hydraulically connected under the site." He noted that arsenic had not been detected in Vineland's public drinking water, which comes from the deeper Kirkwood aquifer. The judge also found DEP's concern that ViChem's discharges posed a threat to private wells in the area which tap the Upper Kirkwood aquifer did "not rise above the level of speculation or conjecture." Finally, the judge found DEP's current position inconsistent with its actions since 1979, when it granted ViChem a TWA that "specifically included the discharges in question."[4] The ALJ concluded,

*298 respondent's alleged reasons set forth at the hearing to support its denial of the issuance of the permit in question appeared to be contrived rather than real and feigned rather than genuine, and they were unsupported by the facts, the history or competent proofs.
The ALJ also ruled that DEP improperly refused to grant ViChem a NJPDES permit to discharge 36,000 gpd of its arsenic-contaminated treatment-plant effluent. He based his decision on his belief that: (1) the DEP's .05 mg/l limitation applied only to inorganic arsenic and that DEP's position was "at the very least unclear and ambiguous with respect to whether [ViChem's] discharges are in violation of the .05 limitation insofar as inorganic arsenic is concerned"; (2) the 1981 ACO between ViChem and DEP "required [DEP] to make a finding that 0.05 ppm arsenic was achievable before it could alter the .7 ppm limit [mentioned in the ACO], which finding [DEP] has never to date made"; and (3) DEP had not established that ViChem's .7 ppm total arsenic discharge, produced by the combined total of the noncontact cooling water and the treated effluent, poses a significant threat to the public health, safety or the environment. In support of his last finding, the judge noted former DEP Commissioner Dewling's November 24, 1986 testimony before our State Senate in which he said that Union Lake, into which the Blackwater Branch flows, was safe for swimming despite an arsenic concentration of .078 ppm. The judge also noted that ViChem produced competent proof that Union Lake could even be used as a source of drinking water without posing a significant threat to human health.
Aside from his factual conclusions, the ALJ also determined that ViChem was totally exempt from NJPDES regulations pursuant to N.J.S.A. 58:10A-13, which ViChem maintains is a "grandfather" clause removing it from the reach of the WPCA *299 and the NJPDES. The ALJ also commented upon the propriety of DEP's dealings with ViChem. He said:
Respondent's conduct in authorizing and permitting the discharges in question for in excess of five years, its failure to take action for more than six months with respect to appellant's request for a stay and its inability to support its position that appellant's discharges constitute a substantial threat to public health, safety and the environment with competent credible evidence lead inescapably to the conclusion that the objectivity of respondent's assertions is highly suspect or nonexistent.
On December 21, 1989 Commissioner Daggett issued his final decision. He declined to follow the ALJ's recommendation and affirmed DEP's previous decision to deny the discharge permits requested by ViChem. The Commissioner found ample support in the administrative record for the denial of ViChem's request for a NJPDES permit to discharge 200,000 gpd noncontact cooling water.
These were the Commissioner's findings. According to fundamental principles of hydrogeology, specifically Darcy's law, ViChem's "discharge to the unlined lagoons increases the hydraulic conductivity and the hydraulic gradiant in the shallow aquifer, thereby forcing groundwater to move at a faster rate into and through the aquifer." Thus the arsenic present in the soil and groundwater from ViChem's past practices would be "flushed" out. The Commissioner found that "[f]lushing high concentrations of contaminants from one media (groundwater) to another (surface water) was not an acceptable method of remediation." The Commissioner concluded that even if the discharge itself was free of arsenic, it would still cause the flushing of the contaminated groundwater from the ViChem site into the surface waters. He found that ViChem's discharge of its contaminated groundwater to surface waters is continually adding "pounds" of arsenic to the surface water bodies. The Commissioner also recognized that the groundwater at the ViChem site contained arsenic in concentrations of up to 10,000 times greater than the stated standard of 0.05 mg/l and that this concentration renders the groundwater a threat to public health by definition.
*300 The Commissioner stated that "the Department's goal is to upgrade the water into which ViChem's discharges flow at least to the minimum levels set in the ground water quality standards." Therefore, he concluded, ViChem cannot successfully argue that it should be allowed to continue to discharge and further degrade the ground and surface waters of the State where ViChem has been to date responsible for the degradation and contamination of the Blackwater Branch, the Maurice River, and Union Lake.
The Commissioner also found that ViChem had "failed to demonstrate to the satisfaction of the Department through hydrogeologic studies ... that potable wells within the upper aquifer were not endangered by the contamination plume" and that "the Department was, therefore, constrained to consider the plume to be a potential threat to public health." Finally, the Commissioner found that ViChem's discharge plume was a potential threat to public health because the upper Kirkwood aquifer may be hydraulically connected to the deeper Kirkwood aquifer, which was a major source of Vineland's drinking water. He pointed out that the potential existence of an hydraulic connection between the two aquifers was first mentioned by ViChem in its NJPDES application. While noting that ViChem had subsequently changed its position and insisted that a continuous impervious clay layer separates the two aquifers, the Commissioner found that the data it submitted to prove this theory "insufficient."
Commissioner Daggett also found ample support for DEP's refusal to grant ViChem a NJPDES permit to discharge 36,000 gpd arsenic-contaminated treatment-plant effluent. He decided that the Department's .05 mg/l arsenic concentration standard referred to total arsenic, not just inorganic arsenic, and that ViChem had failed to meet that standard. The Commissioner also rejected the ALJ's interpretation of the 1981 ACO. In the Commissioner's view, the ACO merely enabled ViChem to discharge at the .7 mg/l arsenic concentration level during the experimental/testing period described in the order. Thus, the *301 Commissioner concluded, "[o]nce it became clear that ViChem would not be able to achieve the .05 [mg/l standard], (i.e., the Department made a decision on achievability), then ViChem's authority to discharge at the interim level was terminated." Finally, the Commissioner disagreed with the ALJ conclusion that N.J.S.A. 58:10A-13 exempts habitual dischargers of pollutants from NJPDES regulation. He ruled that
Any person who discharges pollutants to the ground or surface waters of this State or onto the land from which it may flow, most definitely is within the purview of the Water Pollution Control Act and the NJPDES regulations. To hold that a discharger of pollutants is exempt from the regulations is contrary to both logic and the entire statutory and regulatory scheme.
The Commissioner concluded that even if N.J.S.A. 58:10A-13 could act as a "grandfather" exemption provision as ViChem contended, the statute was "irrelevant" in this case because, as a factual matter, ViChem did not fall within the purview of the section, even under the interpretation which it urged.

I
ViChem first contends that N.J.S.A. 58:10A-13 exempts or immunizes it from application of the Water Pollution Control Act of 1977 (WPCA or Act) and the NJPDES regulations implementing this Act. N.J.S.A. 58:10A-13 provides:
This act shall not affect, impair or invalidate any action or proceeding, civil or criminal, brought by or against the department, pending on the effective date of this act [July 24, 1977]: all such actions or proceedings may and shall be continued to final judgment, decree or decision, as if the foregoing provisions had not taken effect; nor shall this act affect orders, rules and regulations heretofore made, promulgated or issued by the department or other matters or proceedings pending before the department or other matters or proceedings pending before the department on the effective date of this act. Such orders, rules, regulations, matters or proceedings shall continue in full force and effect until amended or repealed pursuant to law.
ViChem's position is unavailing. We view this section as a provision for an orderly transition from the old practice to the new Act, not as an immunity or exemption from regulation, as ViChem urges.
The ALJ found that DEP's 1973 civil action against ViChem ultimately resulted in DEP's issuance of a TWA to ViChem in *302 1979. Thus viewed, the ALJ decided that the entire course of dealing between ViChem and DEP between 1973 and 1979 was a "matter" pending before the department at the time the WPCA became effective. From this premise the judge
concluded that the express language of [N.J.S.A. 58:10A-13.] excludes the subject matter of [the 1973] lawsuit from the remainder of the [WPCA] until the proceedings emanating from the lawsuit proceeded to final judgment, decree or decision and/or until the proceedings were thereafter amended or repealed pursuant to law. The 1979 approval included [ViChem's] discharges of treatment plant effluent and uncontaminated noncontact cooling water and the allowable arsenic concentrations by way of discharges in connection therewith. [DEP's] approval of [ViChem's] discharges was later modified by the 1981 Administrative Consent Order and therefore superseded the requirements of [the WPCA]. [DEP] has never taken any action to revoke, alter or amend the treatment works approval and/or the Administrative Consent Order "pursuant to law."
The Commissioner rejected the ALJ's reasoning and we think properly so. In the Commissioner's view, N.J.S.A. 58:10A-13 did not remove dischargers of pollutants from the purview of the WPCA or the NJPDES regulations. The Commissioner also rejected the ALJ's factual premise that ViChem had a "matter" pending before DEP at the time the WPCA became effective. In this regard, the Commissioner said:
The lawsuit initiated by the Department in 1973 pursuant to a prior water pollution statute ended in March 1977 when a consent order was entered. While it is true that the consent order contained items which would not be completed by March 1977, final judgment was entered March 23, 1977. Therefore, the lawsuit ended prior to the enactment and effective date of the New Jersey Water Pollution Control Act, July 1977. Thus, there was no lawsuit pending at that time, rendering N.J.S.A. 58:10A-13 irrelevant. Subsequently, the Department was forced to bring three separate and distinct Motions to Enforce Litigant's Rights. However, the Department was required to do so because of ViChem's dilatory behavior in failing to comply with the deadlines set forth in the judicial consent order. Thus, ViChem cannot now benefit from "dragging its feet" in meeting the requirements of the order entered.
The ALJ's factual conclusion that the entire relationship between ViChem and DEP from 1973 to 1979 constituted a "matter" pending within the meaning of N.J.S.A. 58:10A-13, thus conferring exemption from the Act, is untenable. Such a magnanimous interpretation of the concept of a pending "matter" would, if N.J.S.A. 58:10A-13 was indeed intended to remove *303 those situations within that statute's ambit from the WPCA, exempt all dischargers of pollutants who had any dealings with DEP subject to enforcement obligations extant on July 24, 1977, the effective date of the Act. We cannot construe N.J.S.A. 58:10A-13 as an obstruction rather than an aid to enforcement and remain true to the Act's intent and purpose. Such a result would be inconsistent with this State's and the Act's declared policy to "restore, enhance and maintain the chemical, physical and biological integrity of [this State's] waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water." N.J.S.A. 58:10A-2. Moreover, "statutes which seek to protect the public health and welfare through the control of water pollution are entitled to a liberal construction so that their beneficial objectives may be accomplished." In re Environmental Protection Dep't., 177 N.J. Super. 304, 318, 426 A.2d 534 (App.Div. 1981) (a case which arose out of ViChem's 1978 treatment work's application). This court will not sanction an interpretation of N.J.S.A. 58:10A-13 which insulates polluters from the reach of the WPCA merely because they had had prior dealings with DEP concerning enforcement obligations not fully complied with on the date the WPCA became effective. A discharger seeking exemption from public health legislation has a heavy burden to show its entitlement. See Lom-Ran v. Dept. of Environmental Protection, 163 N.J. Super. 376, 385, 394 A.2d 1233 (App.Div. 1978) (exemption from WPCA sought and denied).
Commissioner Daggett's conclusion that there was no "matter" justifying exemption pending at the time the WPCA became effective is affirmed. As the Commissioner correctly observed, the 1973 lawsuit culminated in a consent order dated March 11, 1977. That consent order directed ViChem to: (1) containerize its arsenic-contaminated waste salts; (2) recirculate and reuse its process liquids; (3) seal its cooling-water discharge pipe except at the final discharge point; (4) establish *304 and report the mean sea level elevations of its monitoring wells; (5) submit a piping diagram detailing the movement of liquids at the ViChem site; (6) submit progress reports specifying the amount of waste salts removed from the ViChem site; (7) determine what type of disposal facility would accept certain fiberboard containers located at the ViChem site for final disposal; and (8) take samples of certain discharges. In short, the 1977 ACO was concerned only with seeing that ViChem ceased discharging arsenic to the environment and properly disposed of arsenic already at the site. ViChem was required to complete all of the actions required by the ACO by April 7, 1977, well before the effective date of the Act, July 24, 1977.
Beyond April 7, 1977 ViChem's only "matter" pending before DEP arose solely because of its own dilatory conduct. Thus, on July 22, 1977 DEP was forced to seek an order enforcing litigants rights because ViChem had failed to comply "with the deadline established by the prior order of [the Chancery Division] dated March 11, 1977 for completion of the containerization of the arsenic wastes dumped on its ... property," as well as its failure to comply with various other requirements of the March 11 order. ViChem cannot rely on acts of noncompliance to avoid the full regulatory impact of the WPCA and the NJPDES.
Indeed, the very 1973 action from which the ALJ believed the other matters "emanated" was brought for enforcement purposes by DEP because ViChem had failed to comply with a 1971 administrative order. That order directed ViChem to take actions on or before May 21, 1971 "in order that the company's industrial wastewaters be properly, adequately and sufficiently treated and/or otherwise be disposed of in a manner approved by [DEP] and further direct[ed] ViChem to cease and desist from discharging its industrial wastewaters into the Blackwater Branch." If ViChem had complied with the 1971 order, and received DEP's approval to discharge at that time, its "grandfather" argument might have some merit. However, ViChem in fact waited about six years to submit its first application for a *305 TWA. Thus, even if N.J.S.A. 58:10A-13 had the "grandfather" effect claimed, the relevant "matter" upon which that statute could operate was clearly ViChem's TWA application. This application, however, was filed after the WPCA became effective and thus N.J.S.A. 58:10A-13 was textually inapplicable.
The ALJ's conclusion that the TWA "emanated" from pre-WPCA actions and is thus insulated from the regulatory impact is most unpersuasive. DEP never solicited ViChem to submit a TWA. From the time of DEP's order until ViChem's 1977 TWA application, DEP's interaction with ViChem had but one design: to get ViChem to stop polluting. ViChem will not now be permitted to use its failure to comply with the 1971 order and the litigation which "emanated" from that noncompliance to support its argument that it is immune from current WPCA and NJPDES regulation.
Nor is there any textual support in the statute for ViChem's claim of exemption from the WPCA because of its ongoing dealings with DEP since 1971. N.J.S.A. 58:10A-13 does not confer exemption on anyone by its terms. It simply provides for an orderly administrative transition from the rather arcane prior regulatory scheme to the present, streamlined and more efficient scheme. By its terms, the Act is to be liberally construed to effectuate its purpose, N.J.S.A. 58:10A-11, including to "continue and extend the powers and responsibilities of the DEP for administering the State's water pollution control program." N.J.S.A. 58:10A-2. Exemptions under the Act are specifically treated under N.J.S.A. 58:10A-6(d). The seven types of potential exemptions are carefully listed. Id. at (d)(1) to (7). We will not imply any additional exemptions from the Act. The Legislature well knows just how to grant exemptions from environmental legislation when it chooses to do so. For example, the Freshwater Wetlands Protection Act of 1987, N.J.S.A. 13:9B-1 to -30, provides for specific exemptions in sections entitled: "Activities exempt from permit and transition area requirements," N.J.S.A. 13:9B-4; and "Exemptions; Hackensack Meadowlands and Pinelands,: N.J.S.A. 13:9B-6. *306 See Matter of Freshwater Wetlands Rules, 238 N.J. Super. 516, 528, 570 A.2d 435 (App.Div. 1989). Implied exemptions are not favored in law and should not be indulged. New Mea Construction Corp. v. Harper, 203 N.J. Super. 486, 502, 497 A.2d 534 (App.Div. 1985); see Service Armament Co. v. Hyland, 70 N.J. 550, 558-559, 362 A.2d 13 (1976); 2A Sutherland, Statutory Construction, § 47.11 at 145 (1984).

II
ViChem next contends that a provision of its 1981 ACO provides it with a right to continue to discharge arsenic at a concentration of 0.7 mg/l rather than the 0.05 mg/l standard provided in N.J.A.C. 7:9-6.6. The provision upon which ViChem relies says:
While the proposed experimental testing is being conducted and until such time as a decision is made by NJDEP on the achievability of 0.05 mg/l effluent limit, ViChem may only discharge its treated water into the unlined lagoon at a level of total arsenic concentration of not more than 0.7 mg/l.
The ALJ interpreted the term "achievability" to mean a determination by DEP that the .05 mg/l standard was "achievable for [ViChem's] treatment plant discharges." He concluded that until DEP made such a determination, ViChem could continue to discharge effluent containing .7 mg/l arsenic.
The Commissioner, on the other hand, did not read the "achievability" language to say that ViChem could discharge until DEP determined ViChem could meet the .05 mg/l standard. In his view, the .7 mg/l level was an interim standard which only applied during the experimental/testing period described in the ACO. In support of this understanding, the Commissioner observed that a covering letter accompanying the ACO sent to ViChem specifically pointed out that the .7 mg/l level was only an "interim standard." The Commissioner also correctly noted that the ALJ's interpretation ignored the possibility that DEP might determine that the .05 mg/l standard could be achieved technologically, although ViChem could not or would not meet that standard. DEP maintains the position *307 that the .05 mg/l standard is technologically achievable despite ViChem's insistence to the contrary. The Commissioner concluded that "once it became clear that ViChem would not be able to achieve the 0.05 [mg/l standard] (i.e., the Department made a decision on achievability), then ViChem's authority to discharge at the [.7 mg/l] interim level was terminated."
The Commissioner's interpretation of the 1981 ACO is reasonable and is affirmed. The Commissioner offered this acceptable rationale:
An interim standard agreed upon in an ACO does not and cannot permanently modify a valid regulatory or permit requirement. To permanently modify a permit or regulation by an ACO would violate and contravene the public notice and comment procedures required for a major modification of a NJPDES permit as well as the mandates of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., set forth to guarantee procedural due process to the citizens of the State. To permanently modify a regulatory standard on a case-by-case basis would be a direct violation of the Administrative Procedure Act which mandates that regulatory standards applicable to a broad class of entities be established following full opportunity for notice and comment by the public.
Furthermore, the NJPDES regulations are very specific on the procedures the Department must follow when any decision is reached concerning a permit to discharge. An ACO cannot override the statutory, regulatory, and procedural requirements the Department is bound to follow. Because ViChem discharges pollutants to the ground waters (and ultimately to the surface waters) of the State, it must obtain a NJPDES permit pursuant to N.J.S.A. 58:10A-6. When an applicant for a NJPDES permit cannot demonstrate that it will comply with all the statutory and regulatory requirements of the permit for which it is applying, then the Department must properly deny the permit.
Where there is substantial evidence in the record to support more than one regulatory conclusion, "it is the agency's choice which governs." De Vitis v. New Jersey Racing Com'n., 202 N.J. Super. 484, 491, 495 A.2d 457 (App.Div. 1985). Here, the language of the 1981 ACO was reasonably construed by the agency, even if it was capable of supporting more than one interpretation. Commissioner Daggett's conclusion was justified by his reasonable interpretation of the ambiguous "achievability" term. Ambiguity of expression in the AOC cannot confer the right to pollute to perpetuity.

*308 III
ViChem contends that the .05 mg/l arsenic standard set forth in N.J.A.C. 7:9-6.6 refers only to inorganic arsenic which it maintains is infinitely more toxic than the organic form. ViChem notes that it is capable of achieving a .05 mg/l concentration of inorganic arsenic. ViChem bases its contention on the undisputed fact that when the DEP established its groundwater-quality standards in 1978, it based them on the then-prevailing federal EPA standards. At that time, EPA based its standards on "total" arsenic, i.e., inorganic and organic forms. 40 C.F.R. Part 141 (1977). Also undisputed is that in 1980 EPA amended its standard to address only inorganic arsenic. 45 Fed.Reg. § 7332. However, New Jersey has never amended its arsenic standard and DEP's administrative conclusion that it continues to apply to total arsenic is affirmed.
Under the Federal Water Pollution Control Act, 33 U.S.C.A. § 1370, State pollution-control measures supersede less stringent federal limitations. DEP's .05 mg/l standard for total arsenic is controlling. ViChem's claim that DEP's arsenic standard refers only to inorganic arsenic is without merit. The DEP regulation on its face draws no distinction between the two forms of arsenic; its plain language supports the Commissioner's view that it refers to total arsenic. To the extent that the amendment of the federal regulation injected any degree of ambiguity into the term "arsenic" as used in N.J.A.C. 7:9-6.6, the Commissioner's reasonable resolution of that ambiguity must be respected. "[A] court must defer to the administrative body's construction of an ambiguous measure if it is a `permissible' or `reasonable' one, even if the court might have preferred a different reading." Somers Associates v. Gloucester Twp., 241 N.J. Super. 323, 343, 575 A.2d 20 (App.Div. 1990), citing Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 843 n. 11, 844, 104 S.Ct. 2778, 2782 n. 11, 2782, 81 L.Ed.2d 694, 703 (1984). Because ViChem's 36,000 gpd treated effluent failed to meet our State's water-quality standard for arsenic, *309 DEP properly denied the issuance of a NJPDES permit for its discharge. See N.J.S.A. 58:10A-6f(1) ("standards established pursuant to the Federal Act or this Act").

IV
ViChem urges that DEP's decision denying it a NJPDES permit to discharge 200,000 gpd of uncontaminated, noncontact cooling water was not supported by substantial credible evidence. While DEP concedes that discharging uncontaminated, noncontact cooling water into a clean site would not violate State law, the discharge proposed here is to a site already severely contaminated with arsenic. DEP contends that, if permitted, such discharge would violate State regulations and constitute a threat to the public health, safety and the environment.
The role of this court in evaluating ViChem's contention is limited to determining whether the conclusions reached by DEP were based on substantial credible evidence in the record. In re Suspension of Heller, 73 N.J. 292, 309, 374 A.2d 1191 (1977). We will not substitute our independent judgment for that of an administrative body merely because there exists a "difference of opinion concerning the evidential persuasiveness of the relevant proofs." De Vitis v. New Jersey Racing Com'n., 202 N.J. Super. at 489, 495 A.2d 457. Moreover, we "will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein." Id. at 489-490, 495 A.2d 457. Finally, we must be mindful of the deference traditionally afforded to an agency's expertise in cases, such as the present one, involving technical matters within the agency's special competence. New Jersey Bell Telephone Company v. State Dep't. of Public Utilities, 162 N.J. Super. 60, 77, 392 A.2d 216 (App.Div. 1978). The presumption of reasonableness is even stronger where "the agency has been delegated discretion to determine the specialized and technical procedures for its tasks." Newark *310 v. Natural Resources Counc. Dept. Env. Prot., 82 N.J. 530, 540, 414 A.2d 1304 (1980).
One basis upon which DEP relied to deny ViChem's noncontact-cooling-water discharge permit was the fact that the proposed 200,000 gpd discharge through arsenic-contaminated soil and groundwater would increase "the rate of groundwater flow into Blackwater Branch and resultant hydraulic and pollutant loading into the Maurice River and Union Lake." The principle which describes such actions was referred to at the hearing as Darcy's law, described by DEP's hydrogeologist, Dr. David Kaplan. He said: "The impact would be an increase in the total volume of water moving off the site. And, also, an increase on the velocity of the ground water moving off site." According to Melinda Dower, a DEP Bureau Chief who worked on ViChem's permit application, ViChem's discharges caused an increased rate of flow of arsenic-contaminated water into the Blackwater Branch and then into Union Lake, which she said was presently contaminated with "large quantities of arsenic." Dower testified that this increased flow of arsenic-contaminated water would exacerbate the Union Lake contamination and was a threat to the public health, safety and the environment.
As ViChem correctly points out, DEP failed to specify precisely how much additional arsenic would be added to Blackwater Branch and Union Lake. Notwithstanding this lack of meticulous precision, we believe it was within the province of the Commissioner's expertise to draw the necessary link between ViChem's discharges passing through its soil and groundwater, containing as much as 10,000 times more arsenic than the limit acceptable for safe drinking water, and the threat to public health. Moreover, N.J.A.C. 7:9-6.5(b) provides:
7:9-6.5 Ground water designated uses and quality criteria.
* * * * * * * *
(b) When existing ground-water quality does not meet the criteria listed N.J.A.C. 7:9-5.6, due primarily to man's activities, the department shall, after a review of all available scientific and technical data, determine whether it shall require dischargers, through a schedule of compliance or other manner deemed *311 appropriate by the Department, to restore and upgrade the ground water to the minimum levels of quality stated in N.J.A.C. 7:9-5.6 or contain the contamination within boundaries determined by the Department. The major consideration in making such a determination shall be whether, in the opinion of the Department, the degradation constitutes a threat to public health and safety or interferes with the present or potential uses of ground water. The timing, nature, and extent of the compliance procedure shall be determined by the Department after a review of the specific factors affecting each individual case.
We find it undisputed that the groundwater under ViChem's site contains arsenic far in excess of our State's groundwater quality standards. The Commissioner determined that "flushing high concentrations of contaminants from one media (ground water) to another (surface water) is not an acceptable method of remediation." We conclude that this reasonable determination standing alone justifies the Department's refusal to issue ViChem a discharge permit. ViChem should not be allowed to export its self-created arsenic contamination problem from its site to other parts of the region. As Melinda Dower testified at the hearing, remediation reasonably envisions removal of the harmful contaminants and not merely their transfer or transport from one part of the environment to another. Dower also sensibly noted that ViChem's contamination problem ultimately will be much easier to remediate if it remained in the groundwater at the site rather than being spread throughout the 26 miles of surface water currently affected by ViChem's discharges.
Another basis for DEP's refusal to grant ViChem a discharge permit for its noncontact cooling water was its belief that the proposed discharge posed a threat to drinking water supplies. DEP's concern had two prongs. First, DEP maintained that the proposed discharge posed a threat to nearby wells which tapped the Upper Kirkwood aquifer and which, ViChem concedes, is contaminated with arsenic. Indeed, Union Lake, which ultimately receives the flow from this aquifer, contains arsenic concentrations in excess of that permitted by our groundwater quality standards. While the evidence supports the view that some wells tap or are capable of tapping the Upper Kirkwood aquifer, DEP provided only scant evidence *312 that these wells are actually polluted. Of the 40 homes with wells capable of tapping the aquifer, only two showed any arsenic contamination and even these wells were within our State's .05 mg/l groundwater quality standard. Nonetheless, with the Upper aquifer concededly arsenic-contaminated, DEP could well have cautiously concluded that ViChem's proposed discharges, which promised to infuse still more arsenic into the aquifer, posed a long-term potential threat to these wells. The Commissioner noted that ViChem's continued failure to delineate the horizontal and vertical extent of its contamination plume, as required by DEP, should preclude ViChem from arguing that the potable wells were not threatened.
Second, DEP claimed that the possibility that the contaminated Upper Kirkwood aquifer was hydraulically connected to the lower Kirkwood aquifer, which Vineland used as a major source for drinking water, justified denying ViChem's noncontact cooling-water discharge permit. The possibility that the two acquifers were connected was first raised in a 1971 ViChem report submitted with its NJPDES permit application (the "Rooney" report) which stated that "[a]vailable data indicate that there is hydraulic interconnection through this water-bearing unit from the surface downward to about 180 feet below the surface in most of the county east of Bridgeton." At the hearing, Dower pointed out that Vineland indeed was east of Bridgeton. A 1982 report (the "Lennon" report) prepared for ViChem suggested "that it is possible that the more contaminated water is taking a much deeper path than was initially believed.... A large amount of infiltration of surface water can have the effect of forcing the more contaminated water to take a deeper path ... In either case, the conditions suggest the need for further investigation." According to DEP, ViChem never adequately established that the two acquifers were not connected. ViChem presently asserts that the Upper and Lower Kirkwood acquifers are separated by an impervious clay layer.
*313 At the hearing ViChem attempted to quell the concerns which it had raised by citing a portion of the Lennon report which indicated that Lennon believed arsenic contamination was confined to the upper 30 feet of the Upper Kirkwood aquifer. Lennon's report noted that he did not believe the deeper aquifer was significantly threatened by the arsenic-contaminated upper aquifer. In support of his position, Lennon's report stated that ViChem's production well, which draws on the lower aquifer and creates a "cone of depression" (or "pulling" force), has never revealed the presence of arsenic which would be expected if the lower aquifer was hydraulically connected to the contaminated upper aquifer. At the hearing, Dower discounted these conclusions, contending that they were based on inadequate data and controls. While conceding that it was speculative whether the two aquifers were connected, Dower stated that ViChem failed to present sufficient data to substantiate its claim that the Upper and Lower acquifers were not hydraulically connected. From all of this, the Commissioner concluded:
Since ViChem never delineated the vertical extent of the plume nor disproved the hydraulic connection, the Department must consider the plume to be a potential threat to public health because the lower Kirkwood is a major source of potable water. The denial of the NJPDES permit was based on adequate technical data; ViChem did not provide sufficient technical information to establish that it was entitled to a NJPDES permit for the 200,000 GPD discharge.
As ViChem correctly observes, at least some of the bases for DEP's denial of its request for a NJPDES permit to discharge the noncontact cooling water are somewhat speculative. But we must defer to DEP's technical expertise in matters such as the present one. We conclude that there was sufficient evidence to support its conclusion that ViChem's permit to discharge its noncontact cooling water was properly denied. Based on the facts presented, DEP was entitled to conclude that to issue such a permit would constitute a threat to public health, safety and the environment and that to permit discharge was inconsistent with the Commissioner's duty to impose "such *314 further discharge restrictions and safeguards as may be necessary to meet water quality standards." N.J.S.A. 58:10A-6(f)(1).
We conclude that ViChem's claim that DEP was required to demonstrate with precision the degree of harm which would be caused by issuance of the requested permit is untenable in view of the substantial present danger of arsenic contamination to the Blackwater Branch, to Union Lake and to Vineland's water supplies, dangers created by ViChem's own past practices. Indeed, serious arsenic contamination has already occurred in the Blackwater Branch and Union Lake and continues to this day. Even less persuasive is ViChem's position that its permit should not have been denied simply because the denial would not of itself solve the contamination problems it has created. Our recent comment in National Chapter of NAIOP v. New Jersey DEP, 241 N.J. Super. 145, 165, 574 A.2d 514 (App.Div. 1990), is pertinent here:
We cannot agree with appellant's claim that the 2.1 mitigation ratio has no scientific basis. There is some support for it. Given this court's deference to the administrative agency's expertise in relation to technical matters, Public Service Electric & Gas v. Dept. of Env. Prot., 193 N.J. Super. 676, 684 [475 A.2d 665] (App.Div. 1984), aff'd o.b. 101 N.J. 95 [501 A.2d 125] (1985), we uphold it. This presumption of reasonableness of agency action is even stronger where the agency "has been delegated discretion to determine the specialized and technical procedures for its tasks." Newark v. Natural Resources Coun. Dept. Env. Prot., 82 N.J. 530, 540 [414 A.2d 1304] (1980). While the DEP's interpretation of the data is not binding on us, it is entitled to substantial weight. See Matter of Declaratory Ruling, 234 N.J. Super. 139, 146-147 [560 A.2d 689] (App.Div. 1989); American Cyanamid v. DEP, 231 N.J. Super. 292, 312-313 [555 A.2d 684] (App.Div.), certif. den. 117 N.J. 89 [563 A.2d 847] (1989).
DEP properly concluded that allowing ViChem to discharge 200,000 gpd noncontact cooling water could well pose a danger to the public health and the environment, contrary to the expressed policy of the WPCA, N.J.S.A. 58:10A-2. DEP properly denied the requested NJPDES permit. DEP was not required to gamble or speculate in favor of granting a permit to *315 a discharger which had posed almost two decades of grave regulatory concern.

V
In its final contention ViChem suggests that we should reverse the Commissioner's decision as "inherently suspect" because he disagreed with the conclusions of the ALJ. See Steinmann v. State, Dept. of Treasury, 116 N.J. 564, 575-576, 562 A.2d 791 (1989), reversing 235 N.J. Super. 356, 562 A.2d 799 (App.Div. 1988), and quoting Judge O'Brien's dissent. Id. at 366, 372, 562 A.2d 799. True, we need accord "little deference" to the fact-finding of the agency "on the issue of credibility," see Clowes v. Terminix Int'l., Inc., 109 N.J. 575, 587-588, 538 A.2d 794 (1988), where it disagrees thereon with the ALJ but we cannot disregard the Commissioner's and his staff's environmental and scientific expertise or his prerogative to draw valid legal conclusions from undisputed facts. Nor are we bound by the legal or policy conclusions of the ALJ. See Public Advocate Dept. v. Public Utility Board, 189 N.J. Super. 491, 507, 460 A.2d 1057 (App.Div. 1983). The Department has and should have the ultimate authority to make the policy decision. In re Uniform Adm'. v. Procedure Rules, 90 N.J. 85, 91-94, 447 A.2d 151 (1982); N.J.S.A. 52:14B-10(c); See Davis, Administrative Law, § 29:15 at 395-396 (1984).
As we review this matter, the Commissioner's disagreement with the ALJ was not on credibility of witnesses but on the scientific and environmental inferences and on the conclusions of law to be drawn from the record as a whole. Ultimately, of course, the Commissioner had the duty to implement the policy of the Water Pollution Control Act as conferred by the Legislature on the Executive Branch and to protect the environment in accordance with that law. In these cases the burden of proof is traditionally upon the applicant for the permit to discharge. See Bayshore v. Sew. Co. v. DEP, 122 N.J. Super. 184, 198, 299 A.2d 751 (Ch.Div. 1973), aff'd o.b. 131 N.J. Super. 37, 328 A.2d 246 (App.Div. 1974).
*316 We find sufficient credible evidence in the record to support the six conclusions which were the enunciated bases for the Commissioner's decision: (1) the ACO did not prevent DEP's termination of the discharges; (2) there was no exemption from the DEP's ground water quality standard for arsenic  0.05 mg/l; (3) DEP had the right to deny the permits and was not estopped or precluded by its prior tolerance of the discharger; (4) the New Jersey standard of .05 mg/l is for both organic and inorganic arsenic, not just inorganic arsenic; (5) there was some scientific basis in the record for banning further ground water discharge; and (6) the evidence did not "preponderate in favor of ViChem." On these bases, Commissioner Daggett reached this "Conclusion" on December 21, 1989:
Based upon the testimony in the record, the evidence adduced and the applicable statutory and regulatory requirements, the Department's determination of March 23, 1987 denying ViChem's application for a NJPDES-DGW permit is hereby AFFIRMED. The decision of the ALJ is hereby REVERSED and all portions of the Initial Decision which are not consistent with this Final Decision of the Department of Environmental Protection are hereby OVERRULED.
Notwithstanding the conclusions I have reached in this Final Decision, the Department's handling of this matter has been poor. The ViChem site is seriously contaminated. Enforcement action was first taken against ViChem in 1971, and yet, the site and the adjacent surface waters remain contaminated. Minimal remediation has been accomplished to date.
ViChem first applied for a NJPDES permit in March, 1982. The draft Notice of Intent to Deny was not issued until April, 1986. While I realize that part of this delay was due to coordination with the Superfund process (originally the 200,000 GPD was to be denied while the 36,000 GPD was to be granted with special conditions because a Superfund ground water remediation was to be in place), the Department's actions took far too long. Furthermore, there is no excuse for not responding to a stay request for nearly seven months. The Department made too many efforts to be conciliatory and cooperative with ViChem. These dilatory actions of the Department resulted in too much delay which inured to the benefit of ViChem and to the detriment of the environment.
While the record is complex, disputatious and susceptible of varying inferences, we are satisfied that the Commissioner's conclusions rest on firm grounds. We find his decision sound, not "inherently suspect," notwithstanding his disagreement *317 with the administrative law judge.[5]
Affirmed.
NOTES
[1] Milligrams per liter (mg/l) is used interchangably throughout the record with parts per million (ppm).
[2] As will be discussed, whether such discharge was in fact specifically authorized by ViChem's TWA is somewhat unclear. ViChem also fails to provide any reference to the record where its "approval" to discharge noncontact cooling water was increased to 200,000 gpd.
[3] Prior to this amendment, both federal and State law applied to total arsenic. DEP maintains that its arsenic concentration standard has never been amended and that this standard applies to total arsenic.
[4] It is not clear whether DEP ever "specifically" approved ViChem's discharge of the noncontact cooling water. DEP's TWA characterized ViChem's application as being for the "construction and operation of an industrial waste treatment facility at a design flow of: 25 GPM (36,000 GPD)." This reference is to the arsenic contaminated treated effluent, not the 200,000 gpd noncontact cooling water. While the approval did state that ViChem could operate its facility in accordance with its "plans," those plans merely stated that "[t]he flow thru the treatment system will be maintained at 36,000 gpd as long as sufficient contaminated flow exists. The maximum discharge into the unlined lagoons will be 186,000 gallons per day." It is thus open to question whether DEP "specifically" approved the 150,000 gpd (which ViChem asserts was later increased to 200,000 gpd) noncontact cooling water discharge or if DEP considered the cumulative ramifications of such discharge in view of ViChem's past practices which left the zone of discharge heavily contaminated with arsenic.
[5] On April 30, 1990 Chief Judge Gerry of the United States District Court in Camden, N.J., entered a judgment in a penalty proceeding (No. 86-1936), brought by the United States in May 1986. This enforcement proceeding was brought pursuant to Sections 3008(a) and (g) of the Solid Waste Disposal Act, commonly referred to as the Resource Conservation and Recovery Act, 42 U.S.C.A. § 6928(a) and (g). The subject matter of this parallel proceeding was arsenic contamination at ViChem's site on Wheat Road in Vineland. Judge Gerry imposed a fine of $1000 per day for 1223 days  a total of $1,223,000  against the defendant Vineland Chemical Co. and its principal, Arthur Schwerdtle. Further, he found that the defendants had the ability to pay the penalty. In that action ViChem had unsuccessfully asserted the ACO and DEP's alleged "bad faith" regulatory practices as defenses to the penalty proceeding. On July 6, 1990 Judge Gerry filed a letter opinion denying post-judgment relief from the $1,223,000 penalty. Interestingly, we did not learn of this parallel enforcement proceeding, from the parties in this case but from a newspaper article announcing Judge Gerry's decision. We make note of the existence of this proceeding of which we take judicial notice, Evid.R. 9(2)(a) and (b), for sake of completeness of the picture in the event of further review of this case. We add that the adjudication in the federal proceeding had no bearing or influence on our decision in this case.