**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0147-20

CHARLES AMER,

     Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

Submitted December 1, 2021 – Decided January 5, 2022

Before Judges Whipple and Susswein.

On appeal from the New Jersey Department of Corrections.

Charles Amer, appellant pro se.

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Beonica A. McClanahan, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Charles Amer, an inmate housed in South Woods State Prison, appeals from a final agency decision by the Department of Corrections (DOC) denying his appeal as to disciplinary adjudication. We reverse and remand.

On April 9, 2020, petitioner was an inmate at Southern State Correctional Facility (SSCF) housed in Unit 2-Right (the Unit), which had been designated as a quarantine unit for inmates exposed by close contact with symptomatic COVID-19 inmates or staff members. On that day, SSCF custody staff had begun the process of moving groups of inmates from three other housing wings into the Unit.

Inmates from the first and second wings were transferred successfully. When staff attempted to bring the final group into the Unit, the inmates within refused to allow them entry. Inmates blocked the door with a table and shouted threats to both staff and the COVID inmates, warning them not to enter and yelling to each other not to allow them entry.

Prison staff announced an institutional Lock-Up at 9:30 p.m. Over loudspeaker, all inmates were ordered to leave the day space and return to their bunks for the final count of the night. The security footage showed that no inmate complied.[1] Instead, it showed some inmates using kiosks and telephones,

_____

[1] The security footage was not provided as part of the appellate record.

socializing, and watching television. At 9:40 p.m., ten minutes after Lock-Up had been called, security footage showed a group of inmates barricading the Unit's entrance with a table to prevent entry. Some wore surgical masks and makeshift face coverings, making it difficult to identify individual participants. Via loudspeaker, staff advised any inmate not participating in the unrest should return to his bunk and remain there for final count. Still, no inmate complied.

The DOC eventually deployed the Special Operations Group and K9 unit to restore order. All sixty-three inmates housed in the Unit were charged for their participation in the disturbance and transported to Prehearing Disciplinary Housing. The DOC charged petitioner with encouraging others to riot, prohibited act *.252, and served him on April 11, 2020. After conducting an investigation, the disciplinary charge was referred to a hearing officer.

Petitioner pled not guilty to the charge and requested, and was granted, the assistance of a counsel substitute. Petitioner requested a polygraph test, but the request was denied. Petitioner declined the opportunity to call witnesses in his own defense.

With the help of counsel, petitioner submitted a written statement in his defense. First, he argued there is no substantial evidence to find him guilty of the offense with which he was charged because no camera footage allows

participants to be clearly identified, and there is no camera footage that shows him participating in any of the activities that took place in the common area of the Unit. Further, petitioner asserted that he was not even in the area where these activities were taking place.

Petitioner also challenged the fairness of his disciplinary hearing. First, petitioner protested the denial of his polygraph request. This was a situation "in which there [was] no clear surveillance, no credible witnesses, and no evidence whatsoever to support the charge" making the polygraph "the only way in which [petitioner] could prove his innocence." Second, petitioner claimed the DOC's failure to provide the two officers working in the Unit that night with pictures "to determine if they could identify the main individuals leading this demonstration" denied him a fair hearing. Last, petitioner argued that COVID restrictions denied him proper representation by counsel substitute because he was able to speak with his counsel only once, for approximately sixty seconds, in the presence of the hearing officer.

Petitioner's Disciplinary Hearing was held on April 30, 2020. In light of COVID, in-person confrontation was denied to all inmates. The Disciplinary Hearing Officer (DHO) also denied requests to view the video evidence.

> a. The following decisions apply to these hearings: [Sixty-three] inmates were charged for engaging in

4

substantially similar conduct at the same time and location. All witnesses for each inmate are the same. The video evidence for all inmates is the same. The DHO will strive to keep all [sixty-three] hearings to a reasonable time frame while protecting the rights of each inmate to defend the case against them. In light of the mass disruption that would be caused by having . . . each of the [sixty-three] inmates make individual requests for evidence and witnesses (the state of emergency has forced the prisons to functionally operate with only essential personnel)[,] [t]he DHO will allow the paralegals/inmates to submit one set of questions per staff for confrontation. It is not feasible, nor necessary for the DHO to gain an understanding of the cases by having the witnesses answer [sixty-three] separate sets of confrontation questions when the evidence and the officer's observations are substantially similar to all [sixty-three] inmates.

b. Similarly, the DHO will show the surveillance video to the paralegals since the video evidence can be up to seven hours. There would be mass disruption if the video had to be shown to [sixty-three] inmates. The video evidence is the same for all [sixty-three] inmates. DHO allowed for counsel substituted to have open access to quarantine inmates during their [twenty] days of [Prehearing Detention] status; [personal protection equipment] was provided to counsel substitutes. Inmate had no prejudices in preparing his defense. Inmate afforded all rights per Avant v. Clifford, [67 N.J. 496, 525-29 (1975)] inmate was able to request polygraph, confrontation, witness.

A-0147-20

In preparation for their disciplinary hearing, inmates were allowed "to make individual requests to evidence and witnesses at their hearings." Petitioner requested a polygraph exam to prove his innocence. The request was denied.

Relying on a disciplinary report prepared by Lt. Chard, the DHO found:

[T]he evidence supports that:

1. The inmate was part of a group that received orders. ([Loudspeaker] announced count up to 9:30pm)[.]

2. The orders were of such a nature that any reasonable person would have understood the orders[] (inmates were given several orders from officers & lieutenant to go down their wings)[.]

3. The orders were loud enough that the entire group could have heard the orders[.]

4. The inmate had ample time to comply with the order[.]

5. No inmate, after receiving warnings, complied with staff orders[] (video shows inmates did not disperse).

When given the opportunity to make a statement in his own defense, petitioner stated: "Everyone was unpacking. I don't know what was going on. I was on my wing or talking to friends in C-Wing."

The DHO found:

Inmate defense not supported, standing out on the wing, is not being on your bunk for count, which is adding to the overall chaos and rioting behavior[.]

6

She then added:

> Just because this inmate was not seen actually pushing the table, does not mean he wasn't involved by yelling, refusing orders and not being on his assigned bed during count. Staff reports they cannot identify any inmates not involved in the incident. No requirements to be "main individual" to be considered guilty. Any behavior that is not compliant with staff orders can be viewed as encouraging and inciting non[-]compliant behaviors. Counsel substitute cannot use his lack of representation as a defense, as his role is to merely ensure inmate receives all rights entitled, his role is not to argue, be adversarial or adjudicate the charge. Nowhere in [N.J.A.C.] 10A is an inmate entitled to speak to the counsel substitute privately or for the DHO to hold a hearing for a minimum amount of time. All pleas[], statements and requested evidence received. No violation of due process. Totality of evidence supports the charge. Reasonable person would believe inmates actions and actions of the group reach level to determine guilt.

Petitioner was found guilty of encouraging other inmates to riot. The resulting disciplinary sanction included 210 days of Administrative Segregation, ninety days' loss of commutation time, and ten days' loss of recreational privileges. In its hearing decision, the DHO noted, "Leniency provided; max sanction not given for category A charge."

A-0147-20

Petitioner appealed. The Assistant Superintendent upheld the decision of the DHO on May 7, 2020 as a final agency decision of the DOC. This appeal followed.

Petitioner argues that the agency action was arbitrary and capricious because the hearing procedure violated his due process rights by denying his request to prove his innocence with a polygraph test and that the DHO's conclusion of his guilt was not supported by sufficient credible evidence. After reviewing the record, we conclude that DOC's final agency decision was arbitrary, capricious, and unreasonable because the evidence in the record is not sufficient to support the offense petitioner was charged with committing.

In Avant v. Clifford, the Court explained the procedural protections afforded to inmates charged with institutional infractions. 67 N.J. 496 (1975). Inmates facing serious discipline must be provided notice of the charge, a reasonable period to prepare a defense, a hearing before a neutral hearing officer or adjustment committee, the right to present witnesses and evidence, and the right to confront and cross-examine DOC witnesses or to obtain the hearing body's reasoning for denying such confrontation and cross-examination. Id. at 525–33; see also McDonald v. Pinchak, 139 N.J. 188 (1995); Jacobs v. Stephens, 139 N.J. 212 (1995). As the Supreme Court noted in McDonald, the regulatory

framework for adjudicating charges "strike[s] the proper balance between the security concerns of the prison, the need for swift and fair discipline, and the due process rights of the inmates." 139 N.J. at 202.

Our scope of review is narrow. As a general matter, we will disturb an agency's adjudicatory decision only upon a finding that the decision is "arbitrary, capricious or unreasonable," or is unsupported "by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579–80 (1980) (citing Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562 (1963)). In determining whether an agency action is arbitrary, capricious, or unreasonable, a reviewing court must examine:

> (1) [W]hether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Carter, 191 N.J. 474, 482 (2007) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

Furthermore, we are deferential to an agency's expertise. See Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001) ("[W]here there is substantial evidence in the record to support more than one

9

regulatory conclusion, it is the agency's choice which governs.") (quotation marks omitted) (quoting In re Vineland Chemical Co., 243 N.J. Super. 285, 307 (App. Div. 1990)).  However, we note that "our review is not 'perfunctory,' nor is 'our function . . . merely to rubberstamp an agency's decision.'" Ibid. (quoting Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 192 (App. Div. 2010)).  Rather, "[w]e are constrained to engage in a 'careful and principled consideration of the agency record and findings.'" Ibid. (quoting Williams v. Dep't of Corr., 330 N.J. Super. 197, 204 (App. Div. 2000)).

In N.J.A.C. 10A:4-4.1, prohibited acts preceded by an asterisk (*) are considered the most serious and result in the most severe sanctions.  Prohibited acts are further subclassified into six categories of severity (Category A through F) with Category A as the most severe, Category E as the least severe, and Category F, which contains an opportunity for inmates found guilty of specified infractions to participate in a substance-use disorder treatment program known as the Drug Diversion Program, if eligible.  These categories correspond to the categories of sanctions at N.J.A.C. 10A:4-5 and the categories in the severity of offense scale at N.J.A.C. 10A:9-2.13.

Under Category A, a finding of guilt for any offense may result in a sanction of five to fifteen days in an Adjustment Unit, up to 365 days in a

Restorative Housing Unit (R.H.U.) per incident, and one or more of the sanctions listed at N.J.A.C. 10A:4-5.1(e), unless a medical or mental health professional determines that the inmate is not appropriate for R.H.U. placement. These include the most serious and violent offenses including *.252 rioting or encouraging others to riot.

Under Category B, a finding of guilt for any offense may result in a sanction of up to 120 days in an R.H.U. per incident and one or more of the sanctions listed at N.J.A.C. 10A:4-5.1(g), unless a medical or mental health professional determines that the inmate is not appropriate for R.H.U. placement. Included in this section are *.256 refusing to obey an order of any staff member and *.502 interfering with the taking of count.

Under Category C, .501 failing to stand count is recognized as a less serious offense.

We agree that deference to the adjudicatory decisions made by DOC is especially appropriate in view of its important mission to safeguard prison safety and security.  See Blanchard v. N.J. Dep't of Corr., 461 N.J. Super. 231, 238–39 (App. Div. 2019) (cautioning that a reviewing court should "not substitute its own judgment for the agency's").  We have said that "prisons are dangerous places, and the courts must afford appropriate deference and flexibility to

11

administrators trying to manage this volatile environment." Id. at 238 (quoting Russo v. N.J. Dep't of Corr., 324 N.J. Super. 576, 584 (App. Div. 1999)). We also acknowledge that DOC has a compelling interest in ensuring that inmates dutifully return to their cells when ordered to do so during a disturbance and ensuing Lock-Up.

However, after reviewing the record, we do not agree there is substantial evidence in the record to support the DOC's decision that petitioner committed the prohibited act *.252 for which he was charged. See Blanchard, 461 N.J. Super. at 237–38 (citing Henry, 81 N.J. at 579–80 (1980)). Substantial evidence has been defined alternately as "such evidence as a reasonable mind might accept as adequate to support a conclusion," and "evidence furnishing a reasonable basis for the agency's action." Ibid. (quoting Figueroa, 414 N.J. Super. at 192) (citations omitted); see also N.J.A.C. 10A:4-9.15(a) ("A finding of guilt at a disciplinary hearing shall be based upon substantial evidence that the inmate has committed a prohibited act.").

Evidence is sufficiently substantial when it is adequate to support the conclusion that petitioner committed the offense of which he was accused. Blanchard, 461 N.J. Super. at 237–38 (quoting Figueroa, 414 N.J. Super. at 192). Here, the DHO found that all inmates were able to hear the command to

12

return to their bunks and were warned that any inmate who failed to do so would be considered a riot participant and that petitioner was among those who failed to do so. Notably, however, the DHO found no other evidence of any specific acts of petitioner.

As N.J.A.C. 10A:4-4.1 separately lists 108 prohibited acts, we consider the DHO's conclusion that "any behavior that is not compliant with staff orders can be viewed as encouraging and inciting non-compliant behaviors" is too broad a brush stroke to support the determination that petitioner encouraged rioting. While an inference might be drawn that petitioner did not comply with the broadcast order for inmates to return to their bunks, the record as it stands does not support a finding that petitioner encouraged and incited others to riot, which is the specific and serious infraction with which he was charged and adjudicated.

We remand this matter to allow the hearing officer to address the proof supporting petitioner's commission of the alleged infraction more fully. This should not preclude that on remand the hearing officer may consider whether there is an alternative basis to charge petitioner with some other prohibited act (triggering entitlement to notice and a hearing to address the newly-charged

A-0147-20

infraction, N.J.A.C. 10A:4-9.16), or whether proof of petitioner's involvement in the events of April 9, 2020 are lacking.

We also conclude that petitioner's procedural arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0147-20